THE AMERICAN PAD & TEXTILE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20295.   Promulgated June 11, 1951.

*David B. Buerger, Esq.*, for the petitioner.
*Louis A. Boxleitner, Esq.*, for the respondent.

OPINION.

OPPER, *Judge:* Respondent has determined deficiencies against petitioner and an overassessment as follows:

| Tax year ended | Tax | Overassessment | Deficiency |
|---|---|---|---|
| Sept. 30: | | | |
| 1941 | Excess profits | $46.35 | |
| 1942 | Income | | $2,064.69 |
| | Excess profits | | 6,082.76 |
| 1943 | Excess profits | | 8,958.91 |

The questions presented are:

1. How should petitioner compute in United States dollars the income of a Canadian branch which maintains accounts and records income in Canadian dollars?

2. May erroneous treatment of an item in determining taxable income of a base period year be corrected in the computation of the excess profits credit based on income?

3. Does the Tax Court have jurisdiction over standard excess profits tax issues for the year ended September 30, 1941, for the purpose of determining an overpayment claimed by petitioner on the basis of a rejected claim for refund predicated on sections 711 (b) (1) (J) (ii) and 721 relating to abnormalities?

4. If this Court has jurisdiction over so-called standard issues presented in 1941, then how should foreign tax credit for the excess profits tax for that year be computed?

Two issues raised have been settled by agreement.   All of the facts were stipulated.   The stipulated facts are hereby found.

Petitioner is an Ohio corporation with its principal office at Greenfield, Ohio. The returns for the periods here involved were filed with the collector at Cincinnati, Ohio.

From the year 1910 and during all periods here involved petitioner maintained operations at two plants. One was at its principal plant at Greenfield, Ohio, where petitioner manufactured and sold horse collar pads, boat cushions, and life saving jackets. The other was at its branch plant at Chatham, Ontario, Canada, where petitioner manufactured and sold work gloves, shirts, and overalls. During all times here involved the management and operation of the two plants were entirely separate and there was no interchange of employees or goods.

The operation of the plant at Chatham was at all times conducted by the use of the Canadian dollar. All books, accounts and dealings with suppliers, employees, customers and Canadian taxing authorities were in terms of the Canadian dollar. On those occasions when funds were transferred from Chatham to Greenfield, Canadian dollars were turned over by the Chatham management to a bank at Chatham which issued its check for the then equivalent in United States dollars, which check was then mailed to Greenfield. At no time during the times here involved were any funds transferred from Greenfield to Chatham.

Both the plants at Greenfield and Chatham valued all inventories at cost and petitioner so stated in its income tax returns. Both plants kept their accounts on the accrual basis and its income tax returns were prepared on that basis. The excess profits tax credit of petitioner was based on income.

From September 16, 1939, and during all periods subsequently involved, there were in effect two rates of exchange for the Canadian dollar. One was the so-called official rate, which was constant at $.90909 (U. S.), i. e., one Canadian dollar was the equivalent of $.90909 in the currency of the United States of America. Under the Canadian Foreign Exchange Control Regulations Canadian dollars could be transmitted to the United States only with the approval of the Canadian Foreign Exchange Control Board. Such approval could be obtained to transmit current profits of a branch business in Canada. In such case the official rate could be obtained from the Canadian banks. The other rate, the so-called free rate, varied from 86 cents to 91 cents (U. S.) and was the rate for which Canadian dollars could be sold in New York. In the figures hereinafter set forth with respect to exchange rates during the period beginning after September 16, 1939, the figures other than $.90909 represent the free rate. All exchange rates prior to September 16, 1939, represent the free rate, there being no official rate prior to that date.

During its base period years, beginning with the year ended June 30, 1937, to September 30, 1940, inclusive, petitioner reported branch income as hereinafter set forth.

In the income tax return of petitioner for the fiscal year ended June 30, 1937, which is the first base period year of petitioner, a net profit of $69,833.67 was included among the items of other income. This amount represented a profit of 70,998.52 Canadian dollars, stated to be the profit from the operations at Chatham, reduced by $1,164.85 claimed as a loss attributable to exchange fluctuation. The latter figure was computed as follows:

Net current assets July 1, 1936_____ 329, 197. 87 Canadian dollars
Converted at $.997213 (exchange rate 7/1/36)_ $328, 280. 40

Claimed loss on exchange at July 1, 1936_____ $917. 47

Net current assets June 30, 1937_____ 388, 067. 54 Canadian dollars
Converted at $.997211 (exchange rate 6/30/37)_ $386, 985. 22

Claimed loss on exchange at June 30, 1937_____ *$2, 082. 32

Claimed increase in loss_____ $1, 164. 85
    *Error of $1,000 made in return.

In the income tax return of petitioner for the fiscal year ended June 30, 1938, a net profit of $12,500.73 was reported as a result of the operations at Chatham. In this return the profit of 16,180.43 Canadian dollars was reduced by $3,679.70, the latter figure representing an alleged loss computed by petitioner on the conversion of Canadian assets. The figure of $3,679.70 was arrived at as follows:

Net current assets June 30, 1938_____ 364, 399. 70 Canadian dollars
Converted at $.989902 (exchange rate 6/30/38)_____ $360, 720. 00

Loss claimed on exchange at 6/30/38_____ $3, 679. 70

In this year petitioner did not make a comparison between the alleged loss on exchange at the beginning of the fiscal year, July 1, 1937, and such loss at the end of the fiscal year, June 30, 1938, but claimed as a loss the alleged difference between the net current assets in Canadian dollars and the net current assets in United States dollars at June 30, 1938.

With the permission of respondent, petitioner changed its fiscal year to the period ended September 30, and accordingly filed a return for the short taxable period from July 1, 1938, to September 30, 1938. The return reported an alleged loss of $3,215.19 as having been sustained from the operations at Chatham. The amount of $3,215.19 was computed as follows:

Loss from operations at Chatham_____ 3, 283. 80 Canadian dollars
Less alleged gain on conversion_____ $68. 61

Claimed loss at Chatham_____ $3, 215. 19

The alleged gain on conversion in the amount of $68.61 was reported in petitioner's return as gain on "conversion of Canadian net current assets to American dollars" and was computed as follows:

Net current assets July 1, 1938_____ 364, 399. 70 Canadian dollars
Converted at $.989902 (exchange rate 7/1/38)_____ $360, 719. 98
Net current assets Sept. 30, 1938_____ 364, 059. 66 Canadian dollars
Converted at $.991015 (exchange rate 9/30/38)_____ 360, 788. 59

Claimed gain on conversion_____ $68. 61

In its income tax return for the fiscal year ended September 30, 1939, petitioner included among the items of income the amount of $23,650.45 and described such amount as "Canadian branch profits." This amount represented the same figure in Canadian dollars, an exchange rate of $1 having been used. Under "other deductions authorized by law" petitioner claimed a deduction of $30,632.94 described as "Canadian exchange—United States dollars." The $30,632.94 was computed as follows:

Net current assets Oct. 1, 1938_____ 364, 059. 66 Canadian dollars
Converted at $.991015 (exchange rate 10/1/38)_ $360, 788. 58

Claimed loss on exchange at Oct. 1, 1938_____ $3, 271. 08
Net current assets Sept. 30, 1939_____ 336, 670. 08 Canadian dollars
Converted at $.899296 (exchange rate 9/30/39)_ $302, 766. 06

Claimed loss on exchange at Sept. 30, 1939_____ $33, 904. 02

Loss claimed for fiscal year ended Sept. 30, 1939_____ $30, 632. 94

The net result of the foregoing was a loss for the year of $6,982.49, being the $30,632.94 deduction claimed minus the $23,650.45 income reported. The method used in computing the alleged loss on exchange for the year ended September 30, 1939, is the same as that used in the return for the fiscal year ended June 30, 1937.

In its income tax return for the fiscal year ended September 30, 1940, petitioner reported an item of income from the operations at Chatham in the amount of 105,861.58 Canadian dollars, which it converted at an exchange rate of $.86625 so as to report income of $91,702.59. Petitioner also claimed a loss on the alleged conversion of the Canadian net current assets in the amount of $10,697.35, which it computed as follows in a schedule attached to its return:

|  | Sept. 30, 1939 | Sept. 30, 1940 | Plus=increase minus=decrease |
|---|---|---|---|
| Net current assets in Canadian dollars_____ | 336, 670. 08 | 387, 674. 73 | +51, 004. 65 |
| Exchange rates_____ | 89. 9296 | 86. 625 | −3. 3046 |
| Net current assets in U. S. dollars_____ | 302, 766. 06 | 335, 823. 23 | +33, 057. 17 |
| Loss—schedule P, items 13-21_____ | 33, 904. 02 | 51, 851. 50 | +17, 947. 48 |

|  | Can. | U. S. |  |
|---|---|---|---|
| Income—included in Item 13_____ | 105, 861. 58 | 91, 702. 59 | 14, 158. 95 |
| Loss on conversion—included in Item 26_____ | _____ | 10, 697. 35 | 10, 697. 39 |
|  |  | 81, 005. 24 |  |
| Income and Excess Profits Tax—Schedule P. Item 4_____ | _____ | 44, 746. 12 |  |
| Net Canadian income (U. S.)_____ | _____ | 36, 259. 12 |  |
| Increase—net current assets_____ | 33, 057. 17 |  |  |
| Reduction—current account_____ | 654. 94 |  |  |
| Increase—fixed assets_____ | 2, 547. 01 |  |  |
|  | 36, 259. 12 |  |  |

The result of the foregoing was the inclusion in the return for this period of the net amount of $81,005.24 from the operation of the Canadian branch, being the $91,702.59 income reported minus the $10,697.35 deduction claimed. Schedule P in the income tax return is a reconciliation of net income and analysis of earned surplus and undivided profits. Items 13 and 21, in Schedule P referred to above, are "Adjustments for tax purposes not recorded on books." Item 26, mentioned above, refers to the item of the same number on page 1 of the petitioner's return, which item is broken down in a separate schedule attached to the return.

With the exception of one year, respondent made no change with respect to items of income or loss reported as having resulted from operation at Chatham. That year, ended June 30, 1937, was made the subject of an examination and in a revenue agent's report dated July 9, 1938, the profit from the operations at Chatham was determined to be $70,800.50, which was arrived at as follows:

Net income_____ 70, 998. 52 Canadian dollars
Converted at $.997211 (exchange rate 6/30/37)_____ $70, 800. 50

The determination of the revenue agent, increasing the taxable profit from Chatham from $69,833.67 to $70,800.50, was agreed to by petitioner.

The correct income in Canadian dollars during the base period years and the value of the Canadian dollar is as follows:

| Taxable period ending | Correct income (loss) Canadian dollars | Value Canadian dollar |
|---|---|---|
| June 30, 1937 | 66, 845. 20 | $1. 00 |
| June 30, 1938 | 15, 491. 96 | . 99 |
| Sept. 30, 1938 | (3. 369. 26) | . 99 |
| Oct. 1, 1938–Aug. 31, 1939 | 14, 969. 85 | . 99 |
| Sept. 1, 1939–Sept. 30, 1939 | 9, 564. 39 | . 90909 |
| Sept. 30, 1939 | 24, 534. 24 | _____ |
| Sept. 30, 1940 | 111, 075. 75 | . 90909 |

After the filing of its original return, petitioner filed an amended return and claim for refund based on sections 721 and 711 (b) (1) (J) (ii).

In a deficiency notice dated June 17, 1948, respondent disallowed petitioner's claim for refund "insofar as same is predicated upon section 721 and section 711 (b) (1) (J) (ii) of the Internal Revenue Code" and determined an overassessment of $46.35 in excess profits tax for that year. In the accompanying statement the disallowance is spelled out as follows:

Your claim for refund of excess profits tax filed for the taxable year ended September 30, 1941, in the amount of $11,348.03 is predicated, inter alia, upon the basis that an increment reflected in your taxable income for said year, which

was attributable to the fluctuation of rates of exchange utilized in converting Canadian assets into United States currency, constitutes net abnormal income attributable to other years, within the purview of section 721 of the Internal Revenue Code. * * *

It is held that you are not entitled to any adjustment * * * under the provisions of said section for the following reasons:

(a) Said increment does not constitute a separate class of income within the meaning of such section;

(b) Said increment does not constitute abnormal income within the meaning of said section, and

(c) Said increment is not attributable to other years within the meaning of such section.

*　　*　　*　　*　　*　　*　　*

It is [also] held that you are not entitled to any adjustments under the provisions of [section 711 (b) (1) (J) (ii)] with respect to said [deductions attributable to fluctuations of rates of exchange] for the reason that said reductions do not constitute deductions, either normal or abnormal, within the purview of said section.

On September 13, 1948, the taxpayer filed a petition with this Court asserting therein that we had jurisdiction for the year ended September 30, 1941, on the basis "of a claim for refund filed by the petitioner on account of abnormalities and rejected by the Commissioner as set forth in the notice of deficiency." This issue has now been abandoned.

As is so frequently the case with questions involving proper bookkeeping methods, the present problem of dealing with the foreign exchange accounting of a branch in another country will not necessarily yield any one perfect answer.[1] Thus, when petitioner, during the base period years, kept the accounts of its foreign branch by the use of almost a half dozen different methods of computing its income and converting from Canadian to United States dollar exchange, it may or may not, as it now claims, have distorted its base period income for excess profits tax purposes, depending on what method it is now concluded should have been followed at that time.

Authority can be quoted for numerous methods of recording the business of a foreign branch or subsidiary.[2] Omitting details, two

---

[1] Illustrating the indefinite nature of treatment to be accorded unrealized losses and gains due to foreign exchange fluctuation, see a report by the Research Department of the American Institute of Accountants, "Accounting Problems Arising from Devaluation of Foreign Currencies," 89 Journal of Accountancy, 34, 36 (January, 1950). It refers to the world-wide scope and unprecedented magnitude of the recent devaluations of foreign currencies and concludes:

　　* * * It is probably impossible to formulate an absolute general rule to cover
　　the determination of the amount of special loss on foreign exchange during such
　　financial periods as are now closing.

[2] For example:

1. Taxpayers trading or manufacturing in foreign countries may convert current assets less current liabilities at the current rate of exchange prevailing at the close of each taxable year. See A. R. R. 15, 2 C. B. 60; O. D. 489, 2 C. B. 60; and *Vietor & Achelis* v. *Salt's Textile Mfg. Co.* (D. C., D. Conn.), 26 F. 2d 249. The *Salt's Textile* case held that the term, current assets, includes inventories, accounts receivable, investments and cash. See also "Accounting Problems Arising from Devaluation of Foreign Currencies," 89

main approaches emerge: first, to compute the income of the foreign branch in the currency of the country of its location and convert into United States dollars at a rate variously approached;[3] and second, to use what is in the nature of a net worth method, comparing the assets at the beginning and end of the year as they are convertible into domestic exchange, thus giving effect to any gain or loss arising from fluctuations in the exchange rate.[4] See Stuetzer "Tax Problems Raised by Foreign Currency Devaluation," 6 Tax Law Review 255.

That the question is one of accounting and not of substantive law appears from a comparison of the results arrived at in foreign exchange cases—not only those dealing with tax consequence of foreign transactions, but even issues such as the time as of which obligations or damages computed in foreign funds should be converted into the necessary United States equivalent. See Fraenkel, "Foreign Moneys in Domestic Courts," 35 Col. Law. Rev., 360, and the interesting discussion in Kades, "Devaluation Revalued," 28 Taxes, 365.

The inconsistency of concluding that purchase and sale of merchandise is a transaction separate from the foreign exchange operation to which it gives rise, *Bernuth Lembcke Co.*, 1 B. T. A. 1051, and

---

Journal of Accountancy, 34, 35. But O. D. 834, 4 C. B. 61, which denies recognition of gain or loss due merely to fluctuation in value of foreign money owned by a taxpayer as an incident to its principal business, would seemingly exclude cash. See also G. C. M. 4954, VII–2 C. B. 293.

2. The method so described, while available for a foreign branch, is different from that permissible in the case of a foreign subsidiary. G. C. M. 4954, *supra*. See Shepard "Foreign Exchange Tax Consequences," 1 Tax Law Review, 232.

3. See footnote 3, *infra*.

4. Assuming the propriety of converting current assets, and recognizing that treatment of unrealized loss or gain resulting from the conversion of current assets depends upon the reasons for the fluctuation and the expected future behavior of foreign exchange, the business merely may make full disclosure of all pertinent facts. See Paton, Accountant's Handbook, Third Edition, p. 1098.

5. Exclude foreign branches from consolidation in the home office income statement and in accordance with the general principle of full disclosure, show instead a prudent estimate of the value of the branch investments. See Kester, Advanced Accounting, Fourth Edition, p. 114.

[3] See O. D. 550, 2 C. B. 61, which provides:
     * * * the net profits of the [foreign] branch for the year should be computed in [native] currency. From the total profits for the year should be subtracted the total amount remitted to the home office during the year, all expressed in [native] currency. To determine the equivalent of the profits in terms of United States money, the amounts remitted should be converted into United States money at the rate of exchange in effect at the date such remittances were made. The balance of the net profits, expressed in [native] currency, should be converted into United States money at the rate of exchange as of the end of the taxable year, regardless of the fact that the profits may not have been remitted to the home office.

[4] See A. R. R. 15 and O. D. 489, *supra;* and *Vietor & Achelis v. Salt's Textile Mfg. Co., supra,* O. D. 489, headed "Computation of net income," provides:
     In the case of a domestic corporation engaged in business in a foreign country, its assets and liabilities (other than capital assets) recorded on its books in terms of the foreign currency, should be appraised in dollars (whether actually converted or not) at the close of each taxable year in which it is engaged in active business at the current or market rate of exchange, if any, then prevailing.

*Joyce-Koebel Co.*, 6 B. T. A. 403,[5] that no gain or loss is realized when foreign exchange operations take place along with the lending and repayment of funds, *North American Mortgage Co.*, 18 B. T. A. 418; cf. *B. F. Goodrich Co.*, 1 T. C. 1098, and that a foreign branch may maintain its accounts so as to reflect foreign exchange fluctuations, *Vietor & Achelis* v. *Salt's Textile Mfg. Co.*, (D. C., D. Conn.), 26 F. 2d 249, A. R. R. 15, and O. D. 489, 2 C. B. 60, can only be explained on the theory that a consistent method of accounting in a regularized and continuous business operation[6] will succeed in reflecting income to a sufficiently accurate degree for Federal income tax purposes.

Granting that there are several acceptable methods for dealing with the accounting problems presented by the conversion of income received in foreign currency, and even granting further that the application of any acceptable method by a taxpayer should not be disturbed, especially if consistently employed, here there was no consistency in the use of any system on the part of either petitioner or respondent; and it does not follow that there cannot be methods so palpably wrong that their use would not be countenanced under any circumstances. Such we view the situation existing here, for example, in the years ending June 30, 1938, and September 30, 1939, when income was computed by a comparison of incomparables based purely on the accidental condition of the foreign exchange market.

Petitioner, and ultimately the respondent, having for those periods employed a wholly inadmissible method for the computation of the petitioner's Canadian income, the question remains whether some proper computation should not be directed and if so, what that method should be. Bearing in mind that under section 734 appropriate adjustments for the tax properly payable in the earlier years will be made and that under the method used petitioner's base period income and its excess profits tax have been erroneously stated, we see no reason why a proper computation on these facts cannot now be ascertained and applied. See *Leonard Refineries, Inc.*, 11 T. C. 1000.

The method contended for from these facts by petitioner may not be exclusive as we have recognized in the preceding discussion, but it is at least permissible under respondent's own ruling. See O. D. 550, *supra*. And respondent does not seriously deny its acceptability. It has the added virtue of being the one ultimately used for the first base period year with the concurrence of both parties. That method would be to compute petitioner's income in Canadian dollars and

[5] Even as to this there are different methods of computing the rate. Cf. O. D. 489, *supra*, directing use of "the current or market rate of exchange prevailing at the time that payment for the goods is actually made" with *Joyce-Koebel Co.*, *supra*, holding that the exchange rate at the date of purchase is controlling.

[6] See Kades, *op. cit.* "This ruling should apply primarily to taxpayers trading or manufacturing in foreign countries and should not be held to apply to isolated or collateral investments in foreign credits or securities." A. R. R. 15, *supra*.

convert to United States dollars at the rate of exchange prevailing on the dates of remittance and year's-end and to use the resulting dollar figure as representing the Canadian income for the period involved. This method, it is true, differs from that employed in the *Salt's Textile* case. Even assuming that case to have been correctly decided, it is not necessary to consider any method exclusively applicable. Under the facts shown here the computation we have already described seems as acceptable as any and in permitting its employment here we need go no further than this.

Although the issue is not expressly disclaimed, neither party discusses the question of whether the free or official rate should be used for fiscal 1940, when Canadian foreign exchange regulations were in effect. Cf. *Foundation Co.*, 14 T. C. 1333. In view, however, of the stipulation that approval could be obtained to transmit current profits of a branch business out of Canada, we assume that the parties intended to eliminate such an issue, and that they agree that the official rate is the one to be employed.

The issue with respect to 1941 must be dismissed for lack of jurisdiction on authority of *Mutual Lumber Co.*, 16 T. C. 370. Although the claim for refund here was predicated on sections 721 and 711, rather than on section 722, the applicable legislation and the reasoning of the *Mutual Lumber Co.* case permit of no different disposition of this proceeding. The motion to dismiss as to 1941 will accordingly be granted.

Reviewed by the Court.

*Decision will be entered under Rule 50.*