**KENMORE et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 229, Docket 22607.

United States Court of Appeals Second Circuit.

Argued May 12, 1953.

Decided June 10, 1953.

I. Henry Kutz, H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Helen Goodner, Sp. Assts. to Atty. Gen., for respondent.

Before SWAN, Chief Judge, and L. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This appeal (petition to review) is from an order of the Tax Court assessing a deficiency in income tax for the year, 1945. The question is whether the petitioners were entitled to deduct a loss in that year, owing to a fire on the night of April 30, 1945 that destroyed their "villa" in Vienna. On December 11, 1941, when we declared war against Germany, Austria was in control of the Germans who continued to occupy Vienna until, at the earliest, April 9, 1945, when the Soviet forces entered part of the city. For this reason the taxpayers concede that under § 127(a)(2) of the Internal Revenue Code [1] the property must be deemed to have been "destroyed" in 1941; and the only question is whether it had been "recovered" under § 127(c)(2) before it was destroyed on the night of April 30th. If it had been, the taxpayers were entitled to deduct the loss; if it had not, they were not. The taxpayers themselves left Vienna in the spring of 1938 and came to the United States in March, 1939. They left the property "under the general management of Franz Schiller, to whom they had given a general power of attorney." The mother and the aunt of the taxpayer, Helene Kenmore, continued to live in the house until some time in 1939, when the mother came to the United States; and at some undisclosed date, the aunt went to live in another district in Vienna. The Tax Court found that "throughout April and May 1945, conditions in Vienna were chaotic, normal life in the city had stopped and the public services were not operating"; but that "the date of the capture of Vienna by the Soviet forces was April 13, 1945." Schiller testified by deposition that he, as the Kenmores' agent, continued to visit the property, inspecting it at least once a week during 1945 "to check as house-manager whether everything was in order and

Lincoln Orens, New York City, for petitioners.

1. § 127(a) (2), Title 26, U.S.C.

to see whether any damages had occurred through bombing or otherwise"; and that it was in perfect condition on April 30, 1945. He also said that "the Michner family occupied the building until its destruction," meaning relatives of the Kenmores. The Tax Court did not accept this testimony, because, as we shall see, it conflicted with the testimony of the aunt; and for this and other reasons it concluded that the taxpayers had not shown that they had been in possession and control of the property at the time of the fire and refused to allow the deduction.

■■ We held in Shahmoon v. Commissioner, 2 Cir., 185 F.2d 384, that § 127(a) (2) is to be read as though the property had ceased to exist during the period of enemy occupation. The plan of the statute was to treat its value on the date of the declaration of war as a deductible loss, and to treat any "recovery" as income or gain: —which of the two, and to what extent, depended upon whether the owner had already deducted the loss to which the section entitled him. What was to constitute a "recovery" the statute left at large, and its meaning is open to debate. The taxpayers argue that upon the cessation of enemy occupation property automatically reverted to its owner, and was "recovered," regardless of any overt act resuming possession on his behalf; therefore, when the Soviet forces "captured" the whole city of Vienna by April 13, 1945, that *ipso facto* constituted a "recovery," because the Kenmores' possession had never been interrupted during the occupation. We do not find it necessary to decide whether an overt act of "recovery" was necessary in the case of property within enemy control, if it had been continuously occupied by the owner, or by someone who had held under him; but there is much to be said for that interpretation, as also, if, although the owner's possession had been interrupted, during the occupation, he regained it before the occupation ended. In neither of these situations would one expect an owner, finding himself upon withdrawal of the enemy in the same posture as when the occupation began, to suppose that some overt act was necessary to indicate a symbolic "recovery."

But, if such an owner wishes to claim such a "recovery," he must prove, either that the possession as it existed when the occupation began was not interrupted, or, if it was interrupted, that he regained possession before it ended; and he has the burden of so doing. In the case at bar the taxpayers did not secure a finding from the Tax Court of either of these facts, and unless the evidence made such a finding imperative, the order should be affirmed.

■■ Attached to their income tax return for the year, 1945, in which first they claimed the deduction and to its later amendment, was a statement over the typed signature of Helene Kenmore that "the Nazis who occupied my villa * * * burned it down prior to their evacuation." An accountant employed by them to prepare the return, made up this statement; and he testified that he did so from information given him by Ervin Kenmore, from which he had got the "impression" that it was "the Nazis, who occupied some of his property, occupied the property in question." Ervin Kenmore stoutly denied that he told the accountant that the "Nazis" had ever occupied the building that burned, although he did tell him that some German officers had for a time occupied part of an apartment house that was on the same land. The attempted explanation is that the accountant misunderstood Ervin Kenmore; that when he spoke of the German officers who had occupied the other house, the accountant assumed that it was they who had burned down the "villa"; and that this mistake escaped correction, not only in the original return, but in the amended one. This explanation may of course be true, but it inevitably gives rise to doubts; for it is indeed strange that the accountant, who must have been trying to support the deduction by the best statement he could make, should have so far misunderstood Ervin Kenmore as to ascribe the loss to enemy action; especially when we remember that that might seem exceedingly telling to anyone, not familiar with the details of the statute. Maybe the statement was a fabrication; but, if so, at least it was damaging to the case at large.

Moreover, the other testimony was also not convincing. As we have said, Schiller swore that he had been employed to visit the "villa" at least once a week, and that "the family Michner" had occupied it, paying no rent but only "the taxes and operation expenses." Moreover, Helene Kenmore swore that three of her family occupied the house after she and her husband left: i. e., her mother, her aunt, Sera Michner, and "a relative" of the aunt, Leopoldine Michner. Concededly, the mother came to the United States long before 1945, and Sera Michner by deposition swore, as we have said, that she had removed to another "district" of the city before the fire. Moreover, she contradicted Helene Kenmore's testimony about the presence of any putative "Leopoldine"; for, when asked whether she or "her relatives ever lived" at the "villa," she answered: "After Mr. and Mrs. Ervin Kenmore had left Vienna, I and Mrs. Helen Kenmore's mother, who is my sister, lived there up to 1939." Obviously, Schiller's testimony was not trustworthy that the Michner family were living in the house on April 30. From all the foregoing it is apparent, not only that the taxpayers did not prove continuous possession extending beyond the end of enemy control, by evidence that it would have been "clearly erroneous" to disregard; but that, judged by the record, it was unlikely that they did have any such possession. As we have said, the burden was on them, and it is plain that they did not carry it.

Order affirmed.