MaddeN, Judge,
delivered the opinion of the court:
The plaintiff sues to recover income and excess profits taxes for its fiscal years 1942 through 1946. The principal asserted basis for recovery has to do with the way in which deductions for bad debts were treated in computing the plaintiff’s taxes.
During the years 1931 through 1934 the plaintiff seems to have had a policy of pushing sales regardless of the credit of the purchasers. Some 13% percent of its accounts proved uncollectible and bad debt deductions from taxable income were taken for them. On March 31, 1935, the plaintiff, under the applicable provision of section 23 (k) of the Revenue Act of 1934, 48 Stat. 680, set up a reserve for bad debts instead of deducting specific bad debts for each year. The initial reserve was $333,716.44 which was approximately 13% percent of the plaintiff’s accounts and notes receivable at the time the reserve was set up. The revenue agent allowed a deduction from income of only $291,135.23, which was 12% percent of the plaintiff’s trade notes and accounts receivable.
*344 In fact, in the fiscal year 1935 during which the $291,135.23 deduction was allowed, the plaintiff’s actual bad debt losses were only $58,952.67. This was because economic conditions were better and a new credit manager was more careful in extending credit.
Under the reserve for bad debts arrangement, if, after the reserve is set up, the taxpayer’s accounts receivable at the end of the next fiscal year have increased, it is allowed to add to the reserve a proper percentage of the increase, and take as a bad debt deduction for that year the sum representing that reasonable percentage of the increase. That addition to the bad debt reserve in fiscal year 1936 was $116,103.70, the Commissioner having reduced the allowable percentage from 12% to 10.
During the fiscal years 1937,1938, and 1940 the plaintiff’s receivables increased each year, and the plaintiff set up on its books a proportionate addition to its reserve for bad debts and was allowed to deduct from its taxable income a somewhat smaller amount, viz. 10 percent of the increase, which amount the revenue agent regarded as sufficient. In the fiscal year 1939 the plaintiff’s receivables decreased, hence there was a subtraction from its bad debt reserve of a percentage of the decrease, and the amount so subtracted from the reserve was, presumably, added to its taxable income. In all of these years the plaintiff’s actual losses from bad debts were nowhere near the amounts added to its bad debt reserve and deducted from its income.
As we shall see, when the Excess Profits Tax statute was passed in 1940, it fixed upon certain years, for this plaintiff the fiscal years 1937 through 1940, as the “base period” years, and the taxpayer’s taxable income in those years became retroactively important in computing its excess profits taxes during the war years.
For the fiscal year ending March 31, 1941, the Commissioner of Internal Revenue did not allow any deduction from taxable income nor any addition to the bad debt reserve because the existing unused reserve seemed ample in the light of the plaintiff’s actual bad debt experience. The plaintiff, commenting in 1943 on this disallowance, claimed that the reserve was inadequate and should have been increased. The *345 Commissioner took no exception, in any regard bere relevant, to the plaintiff's returns for 1942 and 1943.
In 1945 the plaintiff asserted its present claim that it should not have been allowed to take the unrealistically large bad debt deductions from its income during the years 1935 to 1940. The obvious reason for this change of position was that those years included the base period years specified in the excess profits tax statute, and the smaller one’s taxable income was during those years, the more of his profits during the war years were “excess profits,” taxable at high rates. If, therefore, the plaintiff’s deductions for bad debts during the base period years had been only the actual amount of its bad debt losses, or the amount which it now says was a reasonable reserve for bad debts, its taxable income during those years would have been larger, and its war time taxable income would not have been so greatly in “excess” of it.
The plaintiff says that the provisions of section 134 of the Internal Kevenue Code of 1939 authorize it to reconstruct its base period taxable income. The title of that section is “Adjustment in Case of Position Inconsistent with Prior Income Tax Liability.” The section, particularly its subsection (b) (1) (A), says that if an item affecting the determination of the excess profits tax credit is treated in a manner inconsistent with its treatment in the determination of the income tax liability of the taxpayer for a prior taxable year or years, then the income tax treatment for the prior taxable year or years should be reopened and recomputed, though the prior year or years would otherwise be foreclosed from reexamination.
The meaning of the statute is by no means clear. The plaintiff asserts that the Commissioner, in denying the plaintiff the right to make any further addition to its bad debt reserve in the fiscal year 1941 and thereafter, was “inconsistent” with his allowance of the original setting up of the reserve in 1935 and of the additions to it in the succeeding years prior to 1941. The Government says that the disallowance in 1941 was not a rejection of the plan of a reserve for bad debts, but was a recognition of the fact that the reserve *346 was already large enough to cover such losses for the year 1941 and some years thereafter.
In Leonard Refineries, Inc., 11 T. C. 1000, the taxpayer claimed depreciation as a deduction in the excess profits tax years 1943 and 1944. It asserted that it had taken excessive depreciation in a base period year and thereby used up its depreciation allowance, but that it should not thereby be prevented from taking proper depreciation in the later years. The Tax Court held that the taxpayer had taken excessive depreciation in the base period year; that it had the right to take proper depreciation in the excess profits tax years; that if it did so, it was required by section 134 to go back and recompute its deductions for depreciation in prior years and pay its taxes for those years according to the recomputation. The result must have been that the taxpayer’s base period income was increased, its income in the war years had less “excess” in it, and it got the depreciation deduction in the war years when the tax rates were high.
In Leonard Refineries the only “inconsistency” was instigated by the taxpayer itself, admitting and asserting that it had taken an improper deduction in a base period year. The Commissioner was not raising the question and could not have raised it because the prior years were foreclosed by the statute of limitations. The Tax Court’s interpretation of section 734 seems to have been that it gave a taxpayer, when it was subjected to the high excess profits tax rates, an opportunity to take a second look at what it had done during the years which were later designated as the base period years, and correct the erroneous computations which it had made during those years, if it would be to its advantage to do so. American Pad & Textile Co., 16 T. C. 1304, is in accord with Leonard Refineries. Carithers-Wallace-Courtenay, 5 T. C. 942; Rosemary Manufacturing Co., 9 T. C. 851; The Kawneer Co., 13 T. C. 336; and Gus Blass Co., 18 T. C. 261, support the doctrine of Leonard Refineries, at least by inference.
The interpretation given to section 734 by the Tax Court in Leonard Refineries is justified by the legislative history of the section. That history shows that the section was a relief measure designed to prevent the hardships and inequalities which would otherwise result, if a corporate taxpayer was *347 not permitted, when computing its excess profits credit, to show its “true income” for the base period years and thus be required to pay excess profits tax rates only upon those profits which were, in fact, excessive. [87 Cong. Eecord pp. 1372-3,1377,77th Cong., 1st Sess.] Section 11 of H. E. 3531, which ultimately became section 734, was explained on the floor of Congress as follows:
Page 28, section 11, provides for adjustment in case of inconsistent positions. This allows for adjustments during the base period as to income and amounts reported for income taxes. It will be remembered that the present law bases the credit on the amount of the normal tax net income for the corporation during the base period. It does not provide for the amount of income as reported on the corporation’s income-tax report, but it provides for the income during the years of the base period. As an illustration, assume that a corporation reported on its income-tax return for one of the years of the base period $100. Now, it comes along when it wants to show as large an amount as it can during the base period for excess-profits tax purposes, and says, “My income for a certain year during the base period was not $100, as was reported, but it was $175, and, therefore, I want the advantage of $175 in that year of the base period for excess-profits tax purposes.” This provision says to the corporation, in effect, “Very well. You may go back and make that adjustment, but you must pay the income tax for the difference between what you reported and what you now say you made during that year of the base period plus interest.” [87 Cong. Eecord pp. 1380-81, 77th Cong., 1st Sess.]
An example cited in the committee reports accompanying H. E. 3531 further supports the view that Congress intended, by the terms of what is now section 734, to give taxpayers this benefit of hindsight in computing their excess profits credit. [H. Eept. 146, pp. 17-18, 77th Cong., 1st Sess.; S. Eept. 75, pp. 17-18, 77th Cong., 1st Sess.]
During the base period years the plaintiff was allowed to take bad debt deductions of 10 percent of its receivables. Its actual bad debt losses ranged from .37 of one percent to 1.13 percent. Under all the facts and circumstances of this case, we conclude that the deductions were grossly excessive and erroneous under the general principles governing the reason *348 ableness of sncb reserves and additions thereto. Black Motor Co., 41 B. T. A. 300; Mill Factors Corp., T. C. 1366; Paramount Liquor Co. v. Commissioner, 242 F. 2d 249 (8th Cir. 1957). The plaintiff should have been required to limit its deductions to its actual losses, or to a reserve amount which bore a reasonable relation to its loss experience. We think section 734 gives the plaintiff the privilege of recomputing its income and income tax for the prior years, and its excess profits tax credit for the excess profits tax years.
The plaintiff claims that the cost of a burglar alarm system installed by it in the year ended March 31,1940, which was taken as a deduction in that year, should have been capitalized and made the subject of depreciation over a number of years. For the reasons elaborated in connection with the bad debt claim, we think the plaintiff’s contention is valid.
The plaintiff makes a similar claim with regard to legal fees paid by it in 1937 in connection with the retirement of its preferred stock. It took a deduction for these fees in the year ended March 31,1937. It now says that it should have capitalized them. That would have been- the proper method of accounting for them. The plaintiff is not asserting a right to do anything with these fees in the excess profits tax years, since they would not be a subject of depreciation. But section 734 (b) (1) seems to be broad enough to allow the recomputation even in this situation.[1] This is an item which affects “the determination of the excess profits credit,” and *349 the plaintiff says it should not have been taken as a deduction from income in the base period year, though it was so taken. This constitutes the necessary inconsistency. The Tax Court decision in The Kawneer Co., supra, seems to be to that effect. See also the legislative history cited above.
In its return for the fiscal years 1942 and 1943, the plaintiff included in its taxable income amounts which had been charged on its books to its bad debt reserve, but which it in those years transferred on its books, apparently to surplus. The amount so returned as income in those two years was somewhat in excess of the amount actually allowed to the plaintiff as bad debt deductions in prior years. If there were to be no recomputation of income and taxes, the plaintiff would seem to have overstated its income for 1943 by the amount of this excess. Since, under our decision, there will be a recomputation, this problem will be solved in the recomputation.
The plaintiff is entitled to recover, with interest as provided by law. The amount of the judgment will be determined in further proceedings had pursuant to Buie 38 (c).
It is so ordered.
Need, Justice {Bet.), sitting by designation; LaRamoee, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, a stipulation of facts, the report of Trial Commissioner Currell Vance, and the briefs and'arguments of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation duly organized under the laws of the State of New York. It maintains its principal place of business at Bulova Park, Flushing, L. I., N. Y. For the years to which this suit applies, the principal place of business was 630 Fifth Avenue, New York, N. Y.
2. At all times pertinent hereto, the plaintiff maintained its books and records on an accrual basis of accounting and filed its returns on a fiscal-year basis ending March 31.
3. Plaintiff duly filed its Federal income and excess-profits tax returns for the fiscal years ended March 81,1941 through March 31, 1946, with the collector of internal revenue, third

*350

*351 4.The taxes set forth in finding 3 have all been paid to the collector of internal revenue, together with the following interest thereon.
Year ended Date paid Amount of interest Nature of tax
Mar. 31,1942. Nov. 16,1943 $289.01 Excess profits tax.
Nov. 15,1943 59.73 Income tax.
Nov. 15,1943 34.04 Declared value excess profits tax.
Mar. 31,1943_ ,Tan. 12,1945 380.28 Income tax.
May 1,1947 8,113.54 Excess profits tax.
Mar. 31,1944_ May 1,1947 5,498.32 Declared value excess profits tax.
May 1,1947 74,284.68 Excess profits tax.
Aug. 14,1944 2,421.01 Excess profits tax.
Aug. 14,1944 28.88
Sept. 14,1944 273.96
^Income tax.
Mar. 31,1945. Apr. 28,1948 8,521.98 Excess profits tax.
Apr. 28,1948 344.69 Declared value excess profits tax.
Mar. 31,1946. May 18,1949 323.34 Declared value excess profits tax
May 18,1949 428.75 Income tax.
May 18,1949 2,947.64 Excess profits tax.
Aug. 15,1946 184.78 Income tax.
5.Plaintiff duly filed claims for refund of Federal taxes on forms 843 with the collector of internal revenue for the fiscal years ended March 31, 1942 through March 31, 1946, inclusive. The amounts of refunds claimed were as follows:
Year ended Date claim filed Declared value excess profits tax Excess profits tax Income tax
Mar. 31,1942.. June 14,1945 $318,857.67
Mar. 31, 1942.. June 14,1945 $7,413.00
Mar. 31,1943-June 14,1945 $90,086.29
Mar. 31,1944-June 14,1945 1,008,403.24
Mar. 31,1945-Aug. 9,1948 103,754.75
Mar. 31,1946-Aug. 9,1948 92,433.65
6. In accordance with Section 3712 (a) (2) of the Internal Eevenue Code of 1939, plaintiff received statutory notice its claim for refund of excess-profits tax for the fiscal year ended March 31, 1945 was disallowed. No formal notice of rejection has been issued with regard to the claims for refund for the fiscal years ended March 31, 1942, March 31, 1943, March 31, 1944, and March 31, 1946. More than 6 months have elapsed since plaintiff filed its claims for refund for the said years.
7. Each of plaintiff’s claims for refund on Form 843 for the fiscal year ended March 31, 1942, claims an increased excess-profits tax credit for an unused excess-profits credit *352 carry-over from the year ended March 31, 1941, and an unused excess-profits credit carry-back from March 31, 1943. Plaintiff’s claim for refund for the fiscal year ended March 31, 1944, claims an unused excess-profits credit carry-over from the fiscal year ended March 31,1943.
8.Plaintiff’s base-period net income, as determined by the Commission of Internal Revenue, is as follows:
Fiscal year ended Average base period net income
Straight average Increase in lowest year sec. 713 (c)
$1,125,914.09 $1,125,914.09 Mai*. 31,1937-
949,465.76 949,465.76 Mar. 31,1938-
488,994.00 754,918.94 Mar. 31, 1939-
944,295.88 944,295.88 Mar. 31, 1940-
3,608,669.73 3,774,594.67 Aggregate-
877,167.43 943,647.67 Average—
Taxpayer has availed itself of the benefits of Section 710 (a) (1) (B) of the Internal Revenue Code of 1939 (80 percent limitation) for the fiscal year ended March 31, 1945, and received a net tax benefit in the amount of $19,374.58.
9. Through the fiscal year ended March 31, 1934, plaintiff charged off bad debts on a “direct charge-off” method. During the fiscal year ended March 31, 1935, plaintiff requested and received permission from the Commissioner of Internal Revenue to charge off bad debts on the “reserve for bad debts” method, which method was used in the years ended March 31, 1935 and March 31, 1936, as well as during the base-period years ended March 31, 1937 through March 31, 1940, inclusive.
10. The amount of initial reserve for bad debts set up at March 31, 1935 was $333,716.44, which represented approximately 131/2 percent of the taxpayer’s total accounts and notes receivable at the end of the year, including two items, “life insurance surrender value” and “advances to broadcasting station.” The 13y2 percent reserve figure was adopted by Emanuel Cohan, plaintiff’s accountant, by obtaining an average of actual bad debts sustained in the years *353 ended March 31, 1931-March 31, 1934, compared with accounts and notes receivable at the end of each of said years as follows:
Year ended Notes and accounts receivable end of year Bad debts Ratio of bad debts to receivables
Mar. 31,1931. $4,952,843 $355,379
Mar. 31,1932. 3,707,013 508,065
Mar. 31, 1933. 2,186,789 703,822
Mar. 31, 1934. 1,848,910 132,061
12,695,555 1,699,327 13.385%
The revenue agent, upon audit of the tax return for the year ended March 31, 1935, allowed a total deduction from income of $291,135.23, representing 12)4 percent of plaintiff’s trade notes and accounts receivable, excluding the two afore-stated items of “life insurance surrender value” and “advances to broadcasting station.” Actual bad debts of $58,952.87 incurred in the year ended March 31, 1935, were not separately deducted but considered included in the amount of $291,135.23.
11. For the fiscal year ended March 31, 1936, the Commissioner of Internal Revenue allowed as a reasonable addition to reserve for bad debts and as a tax deduction an amount equal to 10 percent of the increase in the trade notes and accounts receivable at March 31,1936, over those of March 31, 1935. On April 1, 1936, the beginning of plaintiff’s base-period years, the balance in the reserve for bad debts previously allowed by the Commissioner of Internal Revenue was $331,062.86.
12. For the fiscal years ended March 31, 1935, through March 31, 1941, inclusive, plaintiff’s sales, trade notes and accounts receivable, actual net bad debts sustained, provision for bad debts per plaintiff’s books, bad debts (reserve method) claimed as tax deductions, bad debts (reserve method) allowed as tax deductions and the cumulative reserve for bad debts per books and for tax purposes were as follows:

*354

*355 • 13. For the fiscal years ended March 31, 1942 through March 31,1946, inclusive, plaintiff’s sales, notes and accounts receivable, actual bad debts sustained, provisions for bad debts per plaintiff’s books, and the cumulative reserve for bad debts per plaintiff’s books, were as follows:
..Year ended Sales Notes and accounts receivable Actual bad debts Provision for bad debts plaintiff's books Cumulative reserve for bad debts plaintiff's books
Mar. 31,1941... $740,353
Mar. 31,1942.. $19,399,557 $5,395,679 $60,477 ($164,921) 514,955
Mar. 31, 1943.. 19,980,902 2,760,078 (3,367) (246,836) 271,486
Mar. 31, 1944-28,753,547 2,900, 565 [1] 10,105 (194,214) 67,166 '
Mar. 31, 1945-35,083,345 2,543,611 (8,921) 76,087
Mar. 31,1946-35,986,164 1,637,655 (4,961) 81,048
14. Plaintiff included in bad debts, and charged the reserve for bad debts with real estate write-downs of $15,809.58 in the fiscal year ended March 31, 1938, for S. Lachman — special account, and $20,985.25 in the year ended March 31, 1944 for Gilgro Eealty Corp. investment, two items not strictly bad debts.
15. The ratio of actual bad debts to receivables at the beginning of the year, the 4-year average ratio of bad debts to receivables and the rate used by the Commissioner of Internal Eevenne are:
Year ended Ratio of bad debts to receivables 4-year average ratio of bad debts to receivables Rate used by commissioner

Percent Percent Percent

Mar. 31, 1935... 3.19 11.05 12.5
Mar. 31,1936... .74 9.05 10
Mar. 31, 1937... .37 2.25 10
Mar. 31,1938... .61 .95 . 10
Mar. 31, 1939.... .74 .63 10
Mar. 31,1940... 1.13 .75 10
16.The cumulative reserve for bad debts of $331,063 at March 31, 1936, as determined by the Commissioner of Internal Eevenne, was sufficient to meet all net bad debts incurred by plaintiff from April 1, 1936, through March 31, 1946, amounting to $228,391.
*356 17.If no further additions were made to the reserve for bad debts of $331,063 (tax basis) at March 1, 1936, the ratio of the reserve to receivables at the end of each subsequent year for the next ten years, would have been in excess of each year’s experience rate of the plaintiff and would have compared to the actual ratio of bad debts to receivables as follows:
Year ended Adjusted ratio of reserve for bad debts to receivables
Mar. 31,1936-
Mar. 31, 1937-
Mar. 31.1938-
Mar. 31.1939-
Mar. 31.1940- [1] 13
Mar. 31, 1941-
Mar. 31, 1942-
Mar. 31, 1943-
Mar. 31, 1944-
Mar. 31, 1945-
Mar. 31, 1946-
18.If no additions to the reserve for bad debts had been allowed after March 31, 1936, the cumulative tax reserve for bad debts at March 31, 1940, the close of plaintiff’s base period, would have been $176,250, which would still have been, percentagewise, more than double the actual experience rate of the plaintiff in the year ended March 31, 1940, and almost Sy2 times the average experience rate of the base-period years.
19.Plaintiff’s ratios of trading bad debts to sales were 1% percent in 1928, 1 percent in 1929, 2ys percent in 1930, 7.1 percent in 1931, 19.2 percent in 1932, 13 percent in 1933, and 1% percent in 1934.
For the fiscal years ended through 1946—

Percent

Mar. 31, 1935-1.05
Mar. 31. 1936-.22
Mar. 31, 1937-.12
Mar. 31, 1938-.19
Mar. 31, 1939-.47
Mar. 31, 1940-.42
Mar. 31, 1941-.23
Mar. 31, 1942... .31

*357
Percent

Mar. 31, 1943_ ([1])
Mar. 31, 1944_ ([1])
Mar. 31, 1945_ ([1])
Mar. 31, 1946_ ([1])
20.Average 3-year ratios of bad debts to sales were:

Tear ended Percent

Mar. 31, 1937_ .36
Mar. 31, 1938_ .17
Mar. 31, 1939_ .25
Mar. 31, 1940_ .34
Mar. 31, 1941_ .36
Mar. 31, 1942_ .32
Mar. 31, 1943_ .17
Mar. 31, 1944_ .07
Mar. 31, 1945_ C)
Mar. 31, 1946_ C)
1 Net recoveries of bad debts.
21. If no further additions were made to the reserve for bad debts of $331,063 (tax basis) at March 31,1936, the reserve for bad debts at the end of each subsequent year for the next 10 years would have been in excess of anticipated bad debts based upon the use of an average 3-year ratio of bad debts to sales.
22. Plaintiff reported as income in its income and declared value excess-profits tax return for the fiscal year ended March 31, 1942, “reduction in reserve for doubtful accounts, $204,722.75” and paid income and excess-profits taxes thereon. The sum was made up as follows:
Bad debts actually sustained-$60,477.48
Additional debit to reserve- 164, 920. 71
225, 398.19
Less: Amount credited to surplus by reason of tbe revenue agent’s decrease in amount credited to tbe reserve and claimed as a deduction for tbe year ended Mar. 31, 1940_ 20,675.44
204,722.75
No adjustment was made in the figure of $204,722.75 by the Commissioner of Internal Bevenue.
*358 23. The $204,722.75 included in excess-profits net income in the year ended March 31,1942, and charged to the reserve for bad debts did not reduce the cumulative book reserve below the cumulative taxable reserve.
24. The decrease in book reserve for bad debts in the year ended March 31, 1942, was to adjust the books for the Commissioner of Internal Eevenue’s disallowance of bad debt deductions in prior years and bring the book reserve more into agreement with the taxable reserve.
25. Plaintiff reported as income in its income and declared value excess-profits tax return for the fiscal year ended March 31,1943, “reduction in reserve for doubtful accounts, $227,541.66” and paid income tax thereon. This sum was made up as follows:
Debit to reserve for bad debts_$246,835. 98
Less: Amount credited to surplus by reason of the revenue agent’s decrease in amount credited to the reserve and claimed as a deduction for year ended Mar. 31, 1941_ 22, 661.23
224,174.75
Add: Recovery for bad debts during year ended March 31, 1943_ 3,366.91
Amount reported in income_ 227,541.66
No adjustment was made in the figure of $227,541.66 by the Commissioner of Internal Eevenue.
26. The $227,541.66 included in excess-profits net income in the year ended March 31,1943, and charged to reserve for bad debts, reduced the cumulative book reserve below the cumulative taxable reserve by $120,636.61, if no change is made in the amount of bad debts previously allowed by the Commissioner of Internal Eevenue.
27. The decrease in book reserve for bad debts in the year ended March 31, 1943, was to reconcile the books to the tax audits in prior years, and in part to reflect the decrease in outstanding accounts and notes receivable at March 31,1943, as compared to the previous year.
28. No deduction for bad debts has been allowed to plaintiff by the Commissioner of Internal Eevenue in the years ■ended March 31,1941 through March 31,1946.
*359 29. In 1934, Frank B. Sheinberg became credit manager of Bulova Watch Co., Inc. Prior to joining plaintiff, Sheinberg had been credit manager for 10 years of Belding Bros. & Co., a large wholesale silk manufacturer in New York City.
30. Prior to 1934, plaintiff had practically no credit policy, the sales department practically dominating the credit department. Credit was being extended far in excess of customer’s own capital in the business. In early 1930’s the credit policy was “thrown to the winds” in order to maintain volume.
31. Upon becoming credit manager, in 1934, Sheinberg put into effect scientific credit policies. He obtained complete and full information from various mercantile agencies of each customer upon which lines of credit were based, and collections were diligently and vigorously followed up.
32. The credit terms of plaintiff during the base-period years and years at issue were sales on—
(1) open account with billing dates in January and July for sales made in the preceding 6 months, with a 2 percent discount allowed if payment was made by the tenth of the month;
(2) ten monthly notes usually beginning 30 days after shipment. No discount was permitted on these sales.
33. “Seasonal dating” credit terms were extended to customers who were financially sound and represented about 75 percent of the plaintiff’s accounts.
34. Losses on accounts sold on “seasonal dating” were trivial in the years ended March 31, 1937 through March 31, 1942. Plaintiff had every reasonable assurance these accounts would not go bad.
35. A note or account receivable was determined to be worthless when plaintiff received notice of bankruptcy or assignment, or was called upon to grant long-time extension of payment. The expected salvage value of each account was set up based upon the particular facts in each case.
36. There were only slight variations between estimated salvage value set up for bad accounts and the amounts actually realized.
*360 37. Plaintiff’s receivables at the end of any one fiscal year were all collected within a 12-month period unless they went bad and were written off.
38. In the calendar years 1931, 1932, and 1933, economic conditions were chaotic, particularly in the jewelry industry, a luxury industry, and a great many of plaintiff’s accounts receivable from retail jewelers practically evaporated. A great many jewelers had to go through bankruptcy, reorganizations and settlements.
39. Beginning in 1934, plaintiff’s business was transacted with economically stronger retailers, those who had weathered the depression without bankruptcy or settlement, and those who had reorganized, and as a result were in sound financial condition.
40. Beginning in 1934, economic conditions improved greatly in the United States. Business failures decreased sharply after the period 1930-1933, particularly in the jewelry industry.
41. The average of financial embarrassments (bankruptcies, receiverships and assignments for the benefit of creditors) in the jewelry industry in 1930-1933 was 959 per annum with liabilities of $24,221,000. In 1934 and 1935, jewelry embarrassments were 294, with liabilities of $4,989,143, and 149 with liabilities of $2,904,958, respectively. The average of financial embarrassments in the jewelry industry during the calendar years 1936-1939 was 206 per annum with liabilities of $2,845,000.
42. Total commercial failures averaged 2,215 per month in the calendar years 1930-1933, inclusive, with average liabilities of $58,314,000 compared with average monthly failures of 903 for $16,690,000 in the base-period years 1936-1939.
43. The United States Department of Commerce Index of Retail Trade rose from 63.1 in 1933 to 98.9 in 1936, and averaged 103.9 in the base-period years.
44. The sharp decrease in bad debts, from the years ended March 31, 1931 through March 31, 1934, to years ended March 31,1936 through March 31,1946, was due to improved economic conditions, sales to the economically stronger accounts, and the adoption of new scientific credit controls.
45. Emanuel Cohan, plaintiff’s accountant, computed the *361 amount added to the reserve for bad debts in the year endekl March 31, 1936, and subsequent years, by using the last known rate allowed by the revenue agent upon examination of prior years’ returns.
46. In determining the amount of the reserve for bad debts no consideration was given to the currentness or age of the receivables, the changing bad debt experience of the plaintiff during the fiscal years ended March 31, 1931, through March 31, 1940, changed economic conditions, or credit policy changes.
47. Plaintiff’s accountant was confused in his treatment of bad debts and reserves, and in some years actually reported as income the bad debts sustained.
48. The reduced amounts allowed by the Commissioner of Internal Revenue as deductions for bad debts (reserve basis) were much in excess of actual bad debts sustained.
49. The percent of receivables used by the Commissioner of Internal Revenue in determining allowable deductions for additions to reserve for bad debts in the base period ranged from 9 to 27 times actual experience of plaintiff.
50. On November 9, 1943, the Commissioner of Internal Revenue addressed a letter to the internal revenue agent in charge, New York, N. Y., relating to the March 31,1941 return of plaintiff, wherein he stated in part that “the taxpayer has been permitted to claim excessive reserves for bad debts in the past * *
51. On November 10, 1944, the Commissioner of Internal Revenue addressed a letter to plaintiff relating to the March 31, 1941 return, wherein he stated in part “the average bad debts charged off for the past 5 years of $42,370.64 amount to about % percent of the average accounts receivable of $5,466,754.98. Applying this percentage to the accounts receivable at the end of the year [March 31, 1941] of $7,954,122.19, the result will be about $69,600 to be compared with the $500,000 already in the reserve * *
52. Plaintiff was also advised in said letter of November 10, 1944, that the amount of bad debt deductions allowed in prior years (years ended March 31, 1937, et seq.) were not reasonable additions to the reserve for bad debts and it was never intended that a taxpayer who deducts an addi *362 tion to a reserve for bad debts should obtain greater deductions than a taxpayer who deducts specific bad debts.
53. Based on economic conditions existing at March 31, 1937, and credit policies in effect, the anticipated bad debts would not be in excess of 2 percent of the receivables. The reserves for bad debts during the base period years 1937 to 1940 were excessive and erroneous under, all the facts and circumstances then known or reasonably to be anticipated. A reasonable reserve during that period would have been 2 percent of the receivables.
54. Plaintiff retired its preferred stock in September 1936. In connection with such retirement, plaintiff incurred and paid $3,750 to Frederick William Greenfield & Co., for special accounting services, and $7,810.07 to Cravath, Swaine & Moore for legal expenses. Both of these items were deducted in the tax return for the year ended March 31, 1937, as legal and accounting expense. The Commissioner of Internal Revenue disallowed $3,750 as a deduction but allowed the balance of $7,810.07.
55. During the fiscal year ended March 31, 1940, plaintiff installed Holmes Electric Protective Service at its office at 630 Fifth Avenue, New York, N. Y., at a cost of $5,204.92, which amount was allowed as a deduction on plaintiff’s tax return for said year.
56. Plaintiff’s lease on its offices at 630 Fifth Avenue, New York, N. Y., was for a period of 10 years beginning May 1, 1939. Said lease provided that all fixtures, equipment and appurtenances, including electrical work installed during the term of the lease, were not to be removed by the tenant.
57. While the first year for which plaintiff claimed the right to revise its excess-profits credit was the fiscal year ended March 31, 1941, no claim for refund was or could be filed for that year, since the adjustment in tax due the defendant under Section 734 of the Internal Revenue Code of 1939 was greater than the excess-profits tax previously paid.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, together with *363 interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined in further proceedings pursuant to Buie 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 20, 1959, that judgment for the plaintiff be entered for $520,049.95, with adjustments for interest as provided by law on the deficiencies and overpayments set out in the stipulation filed March 32, 1959.

 See. 734. (b) Circumstances of Adjustment.—
(1) If—
(A) in determining at any time the tax of a taxpayer under this sub-chapter an item affecting the determination of the excess profits credit is treated in a manner inconsistent -with the treatment accorded such item in the determination of the income-tax liability of such taxpayer or a predecessor for a prior taxable year or years, and
(B) the treatment of such item in the prior taxable year or years consistently with the determination under this subchapter would effect an increase or decrease in the amount of the income taxes previously determined for such taxable year or years, and
(C) on the date of such determination of the tax under this subchapter correction of the effect of the inconsistent treatment in any one or more of the prior taxable years is prevented (except for the provisions of section 3801) by the operation of any law or rule of law (other than section 3761, relating to compromises),
then the correction shall be made by an adjustment under this section. If in a subsequent determination of the tax under this subchapter for such taxable year such inconsistent treatment is not adopted, then the correction shall not be made in connection with such subsequent determination.

 Includes nontrading real estate loss of $20,985, Gilgro Eealty Corp.

 Recoveries.

 Recoveries.