**STANDARD OIL COMPANY (NEW JERSEY), Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 10, Docket 28822.**

United States Court of Appeals
Second Circuit.

Argued Sept. 28, 1964.
Decided Nov. 5, 1964.

Friendly, Circuit Judge, dissented.

D. Nelson Adams, New York City (Joel J. Cohen, New York City, on the brief), for appellant.

Vincent L. Broderick, Chief Asst. U. S. Atty., for the Southern District of New York (Harry Marselli, Department of Justice, on the brief), for appellee.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge.

This appeal raises interesting questions concerning the construction of the excess profit provisions of the 1939 Internal Revenue Code. Standard Oil Company (New Jersey) brought an action in the United States District Court for the Southern District of New York to recover $2,181,489.88 paid as interest on asserted "potential deficiencies" in its consolidated excess profits tax returns for the years 1943 and 1944. Chief Judge Ryan granted the Government's motion for summary judgment and dismissed the complaint. From the judgment entered upon that order Standard now appeals.

It contends that interest should not have been assessed because an unused excess profits credit carryover from 1941 prevented any deficiency from ever arising on the 1943 and 1944 returns. Standard concedes, however, that it is entitled to this unused excess profits credit carryover from 1941 only if—and this is the crucial "if" in the case—it could deduct alleged "war losses" in computing its 1941 net income for excess profits tax purposes even though it had not claimed those losses in computing its normal income tax for the same year. The District Court held that the taxpayer could not take this inconsistent position and that its choice not to take the war loss deduction for income tax purposes rendered the deduction unavailable in computing excess profits taxes. We agree and therefore affirm the judgment in favor of the Government.

Fundamental to an appreciation of Standard's tax strategy in the years in question, and the Government's view of this strategy, is an examination of the detailed yet mazelike provisions of the World War II excess profits tax. The amount of profits a corporate taxpayer might accumulate without tax was measured by its "excess profits net income" (net income for excess profits purposes being roughly equivalent to net income for normal income tax purposes in a given year) during a pre-war base period (1936–1939). This permitted ac-

cumulation was denominated the "excess profits credit." I.R.C. of 1939, §§ 713(e), 711(b) (1). To the extent that a taxpayer in 1941 and subsequent years, had excess profits net income less than the allowable excess profits credit, it was entitled to an "*unused* excess profits credit." §§ 710(c), 711(a). This unused excess profits credit could be carried forward or carried back two years to later or earlier tax years for the purpose of reducing or eliminating any excess profits tax liability in those years. § 710 (c), as amended by I.R.A. of 1942.

In 1942 war losses were for the first time made deductible for purposes of computing both the ordinary income tax and the excess profits tax. Section 127, added by Revenue Act of 1942, Ch. 619, 56 Stat. 852. Accordingly, Standard's 1941 income tax return, as originally filed, reflected no deduction for war losses. The same was true of the 1941 excess profits tax return filed on a consolidated basis by Standard and its affiliates, which even absent a war loss deduction showed no express profits tax liability. When the war loss deduction did become retroactively available in 1942, the only immediate reaction of the taxpayer was to cause its wholly-owned subsidiary, Standard Oil Company of New Jersey ("Esso"), to file an amended income tax return for 1941 claiming as a deduction $6,801,094.50 in war losses sustained in that year. But parent Standard chose not to claim any such war loss deductions either for 1941 income tax or excess profits tax purposes.

Not until 1944 did Standard finally recognize the war loss deduction provisions with respect to its 1941 tax year. In that year Standard, on behalf of itself and its affiliated companies, filed a consolidated excess profits tax return for 1943, claiming an excess profits carryover from 1941 based in part on alleged war losses of $50,000,000 suffered but not deducted in 1941.[1] The carryover claimed eliminated any excess profits tax liability for 1943. Similarly, Standard's

consolidated excess profits tax return for 1944 disclosed no tax liability because of a carryover of unused excess profits credit from 1942 which also arose in part from the alleged $50,000,000 war losses sustained in 1941. Of important significance on this appeal is the fact that Standard, in taking advantage of the unused excess profits credit carryovers, relied on the alleged $50,000,000 war losses *even though it had never claimed them as deductions on its 1941 income tax return.*

If Standard did not already recognize this inconsistency, it certainly learned from the best authority by 1947. For, concededly, when Standard's 1941 income tax return was audited in 1947 the examining agent indicated that he would be willing to allow the deduction of the 1941 war losses in the 1941 returns, subject to substantiation of the $50,000,000 figure. But, Standard elected not to claim the alleged war losses as deductions in computing normal tax net income for 1941 because (1) at the time, an excess profits credit carryback from 1945 was known and more than sufficient to eliminate any excess profits tax in 1943 and 1944 and (2) the election would eliminate any problem in determining and reporting war loss recoveries.

The wisdom of this election, however, was thrown into doubt by an unforeseen decision of the United States Supreme Court. In 1950 the Court, in Manning v. Seeley Tube & Box Co., 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950), established the doctrine of a "potential deficiency," exposing taxpayers to liability for interest on tax deficiencies even though there was no ultimate liability for the tax upon which the interest was assessed. In short, even if Standard's excess profits tax deficiencies for the years 1943 and 1944 were ultimately eliminated by the carryback of an unused excess profits credit from 1945, the Commissioner of Internal Revenue could nonetheless assess interest on those de-

---

1. No part of this alleged $50,000,000 in war losses included the $6,801,094.50 war loss which Esso had claimed in computing its 1941 normal-tax net income.

ficiencies while they remained in Standard's treasury, instead of being available for Government spending.

The Commissioner took advantage of the "potential deficiency" doctrine in 1954 when he audited Standard's excess profits tax returns for 1943 and 1944. He disallowed a portion of the unused excess profits credit carryovers from the years 1941 and 1942, which Standard from the outset had used to eliminate excess profits tax liability for 1943 and 1944. The Commissioner maintained that Standard could not claim war loss deductions in computing the unused excess profits credit because the same deductions had not been taken for income tax purposes. The disallowances created deficiencies in the 1943 and 1944 excess profits tax returns for which the Commissioner assessed interest until the deficiencies abated, on March 15, 1946, by the application of the unused excess profits credit carryback from the year 1945.

But, it was obvious that if a carryover of unused excess profits credit from 1941 were available, it would have eliminated the 1943 and 1944 deficiencies from the outset and thus would have avoided any liability for interest on potential deficiencies. Because Standard believes that it could have relied upon the 1941 war losses in 1943 and 1944 in computing its unused excess profits credit carryover for 1941 even though it did not claim the losses in computing its 1941 income tax, it takes the position that there was never any deficiency in 1943 or 1944, and therefore seeks to recover the interest collected by the Government.

On this appeal neither party disputes the amount of Standard's excess profits credit for 1941. The contest, rather, focuses directly on the amount of excess profits net income for 1941. The issue

is whether the 1941 excess profits net income could properly be retroactively reduced by the alleged $50,000,000 war losses, never claimed as deductions by Standard in computing normal-tax net income for income tax purposes, thereby increasing the unused excess profits credits carried over into 1943 and 1944. A resolution of this issue depends in turn upon an examination of Section 711(a), which equates the excess profits net income for 1941, with certain irrelevant adjustments, to the normal-tax net income "for such year." Does such net income equal the amount of gross income less deductions *actually* taken or gross income less deductions that *could* have been taken?

Standard's argument, concisely summarized, is that the war loss deduction was required under the statute to be allowed as a matter of law and that its failure to claim the deduction should not operate to deprive it of the benefits conferred by the statute. The Commissioner's mistake of law in failing to allow the war losses on the last applicable date under the Code should, according to this argument, now be rectified by permitting the deduction to be taken in computing 1941 excess profits net income. But, we feel compelled by the plain language of the Code and our common sense understanding of the deduction provisions to reject these contentions.

In defining the concept of a war loss Section 127(a) (2) simply provided that "[p]roperty * * * shall be deemed to have been destroyed or seized on the date war * * * was declared." But that section by itself did not make war losses deductible; for the permission to do so one must turn to Section 23(f)'s general provision that losses sustained by a taxpayer "shall be allowed" as deductions.[2]

2. Section 127 simply fixed guidelines for discovering the tax consequences of war losses. It established, for example, criteria for determining the fact of loss and the period within which the loss occurred and set forth the standards for determining the basis upon recovery of

property deemed seized or destroyed. For this reason, we do not believe the language of Section 127, its legislative history, or the Regulations promulgated under the section are helpful in deciding whether the deduction of war losses was mandatory rather than elective.

Standard's entire argument therefore must stand or fall on whether Section 23(f) *mandated* or compelled the taking of war loss deductions. That section says, however, that deductions "shall be allowed"—not that they "shall be taken" or "shall be claimed." We are not persuaded by the contention that the statute's requirement that the Internal Revenue Service must "allow" a deduction necessarily means that a taxpayer is required to "claim" the deduction which he has been given as a matter of grace. This is a *non sequitur* as we view it. There are many instances where a deduction must be allowed, but it is not allowed unless and until it is claimed by the taxpayer and approved by the Internal Revenue Service. A taxpayer, for example, might not claim a deduction for charitable contributions or medical bills because he does not want his spouse or anyone else to know that he has incurred certain expenses; the tax collector "must" and will "allow" such deductions only when they are properly claimed.

■ Nor can we agree with the suggestion that deductions are mandatory unless the Internal Revenue Code has explicitly created a right of election. Although some sections of the Code are mandatory and some confer rights of election upon taxpayers, we have been shown no section which required the taking of war loss deductions or any other "deductions."[3] Since Congress permits deductions only as a matter of grace, the deduction sections are to be strictly construed against the taxpayer, and "general equitable considerations" do not control the question of what deductions are permissible, United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235–236, 75 S.Ct. 733, 99 L.Ed. 1024 (1955); 4 Mertens, Law of Federal

Income Taxation § 25.03 (Zimet rev. 1960), we find it difficult to say that a taxpayer must as a matter of law take every deduction to which he is entitled. We have been informed—and Standard has not taken issue—that the understanding of both taxpayers and the tax collector in 1941 (and in 1947) was that one looked to deductions *actually* taken, provided they were allowable, in computing normal-tax net income for both income taxes and excess profits taxes, and we see no reason why this understanding and practice should be ignored.

We do not read Shahmoon v. Commissioner, 185 F.2d 384 (2d Cir. 1950), as good authority for the proposition that taxpayers could not elect whether to claim war loss deductions. There the question was whether in 1944 the taxpayer could claim a deduction for *depreciation* of property on the Chinese mainland which was "deemed" lost in 1941 by the terms of Section 127. The court held that the depreciation deduction was not allowable because the property was deprived of its basis in 1941. Judge Augustus N. Hand wrote that the statute "merely requires the taxpayers to take any deduction they *may* seek by way of a war loss, and not by way of depreciation." 185 F.2d at 386 (emphasis added). Surely a holding that taxpayers could not depreciate property deemed lost under Section 127 does not mean that taxpayers were required to deduct the value of such property as losses under Section 23(f). Indeed, the Senate Finance Committee report accompanying the bill which included Section 127 recognized that "allowable deductions" might not be "allowed," one reason being that a taxpayer might choose not to claim the war loss deduction. S.Rep.No.1631, 77th Cong., 2d Sess., p. 129.

---

3. Lambert v. Commissioner, 338 F.2d 4 (2d Cir. 1964), affirming T.C.Mem. 1963–296, did not involve a "deduction." Section 333 simply permits "qualified electing shareholders" to postpone a capital gains tax upon gain resulting from the liquidation of a corporation to the extent of corporate assets received by the shareholders which are not represented by accumulated earnings and profits. This Court simply held that the election requirement of that section was to be strictly construed against the taxpayer, regardless of the harsh result.

For much the same reasons, Kenmore v. Commissioner, 205 F.2d 90 (2d Cir. 1953), does not support Standard's position. The issue there was whether a Viennese villa which was deemed destroyed in 1941 had been "recovered" under Section 127 before it was destroyed by fire in 1945 so that it had a basis for loss at the time of the fire. The court simply decided that the taxpayer could not claim a casualty loss from the 1945 fire without first proving that he had recovered the villa before the fire. We see no reason to read into a decision interpreting the *recovery* provisions of Section 127 an unexpressed holding on the *deductibility* of war losses. If anything, we would be disposed to read Judge Learned Hand's statement that the plan of Section 127 was to treat the value of "war loss" property "as a deductible loss, and to treat any 'recovery' as income or gain:—which of the two, and to what extent, depended upon whether the owner had already deducted the loss to which the section entitled him," 205 F.2d at 92, as supporting the Government's position that a taxpayer had a choice whether or not to claim a deduction for war losses.

Finally, Standard argues that the income tax and the excess profits tax are separate taxes and that a mistake of law in the computation of income taxes is not binding for purposes of the excess profits tax. But by our holding that Standard was entitled to choose and did choose in 1941 and again in 1947 not to take a war loss deduction, we have undermined the foundation upon which this mistake theory rests. Indeed, Standard concedes that if the statute gave taxpayers the option to deduct or not deduct war losses, an election for income tax purposes would have been controlling for excess profits tax purposes. (Reply Brief, p. 9.)

In any event, as we read the excess profits sections of the Code, Standard was required to look directly to the choices made in its 1941 income tax return in computing its unused excess profits credit for that year. As we have previously indicated, Section 711 specifically equated "[t]he excess profits net income for any taxable year," with some irrelevant adjustments, to "the normal-tax net income * * * for *such year.*" (Emphasis added.) The reference to a specific year carries the strong suggestion that the statute equates *amounts* rather than definitions, for one does not tie a definition down to a particular year. If the draftsmen wanted the excess profits net income to be computed directly from the Code's *definition* of normal-tax net income, they would not have used the "for such year" phrase; by incorporating that reference we believe they wanted the taxpayer to use the same figures found in his income tax return for the year in question.

We cannot accept the suggestion that because taxpayers were permitted in computing the "excess profits credit" to disregard the actual figures used in pre-War base period years and instead represent true prior income, the same freedom to take inconsistent positions should be allowed in computing the "unused excess profits credit." The cases that permit recomputation in figuring the "excess profits credit" all proceed on the rationale that the taxpayer made a real mistake in computation in a prior year. For example, in Leonard Refineries, Inc., 11 T.C. 1000 (1948), the taxpayer had taken excessive depreciation in computing its income tax liability in a base-period year; nevertheless, the Tax Court allowed the taxpayer to use its actual, rather than its fictitiously low, net income for that year in computing its average base period net income for excess profits tax purposes in 1943 and 1944. But we have already held that Standard's decision not to take a war loss deduction for 1941 was not a mistake but simply the conscious exercise of an option permitted by the Code.

Nor can the taxpayer argue that because the statute does not explicitly prohibit recomputation it may recompute figures used in prior income tax returns in calculating its unused excess profits credit. The specific adjustments which

Section 711(a) permitted taxpayers to make in computing excess profits net income were not even remotely related to war losses.

When Standard consciously elected in 1947 not to take a war loss deduction in its income tax return for 1941, it recognized that it had a right to claim or not to claim the deduction. At that time Standard properly understood that war loss deductions were elective; its present position that the deductions were mandatory is contrary to the plain meaning of the statute. We hold that Standard was bound by its 1941 choice for excess profits purposes and therefore affirm the judgment dismissing the complaint.

FRIENDLY, Circuit Judge (dissenting):

If the issue here were whether Standard could utilize different figures of net income for normal income and excess profits taxes for 1941, I would agree that § 711(a) of the 1939 Code would require a negative answer. Standard never attempted to do that; the issue is a quite different one—whether in computing its 1943 and 1944 excess profits taxes Standard could determine its "unused excess profits credit" arising from 1941 operations by taking an altogether proper deduction which it had not taken, and never did take, from its 1941 income as reported on returns relating to its taxes for that year. I think it could.

Section 710(c)(2) defines "unused excess profits credit" as "the excess, if any, of the excess profits credit for any taxable year beginning after December 31, 1939, over the excess profits net income for such taxable year, computed on the basis of the excess profits credit applicable to such taxable year." Section 711 (a) says that "the excess profit net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13(a)(2) * * *, for such year" except for certain adjustments. I see nothing in this language that prevents calculation of the unused excess profits

credit for a prior year on the basis of net income for that year as it really was, rather than on the basis of a higher figure reported in the original or an amended return. The Government has pointed to no policy reason why Congress would have thought it important to insist that a corporate taxpayer should not reduce its excess profits tax by so recomputing its net income and consequently its unused excess profits credit for a prior year to take account of a valid deduction, previously overlooked or disregarded as inconsequential, unless the taxpayer also revised its income tax return for the earlier year—usually with a further reduction in the revenue; the rare case where taking the deduction might increase the regular tax was hardly in Congress' mind. Precisely such recomputation has long been allowed in an analogous situation—where a taxpayer wishes to make an upward adjustment of net income for a base period year in order to increase its "excess profits credit" under §§ 712 and 713. Rosemary Mfg. Co., 9 T.C. 851 (1947); Leonard Refineries, Inc., 11 T.C. 1000 (1948); United States Guarantee Co., 8 CCH Tax Ct.Mem. 510 (1949), rev'd on other grounds sub nom. C. I. R. v. United States Guarantee Co., 190 F.2d 152 (2 Cir. 1951); American Pad & Textile Co., 16 T.C. 1304 (1951). These decisions are best justified on the ground, stated in Leonard Refineries, 11 T.C. at 1006, that "No excess profits tax provision in the code specifically requires that the excess profits credit under section 713 be computed by the use of net income figures used by the taxpayer in its income tax returns for base period years"; I read § 734, added to the Code in 1941 and also mentioned in Leonard Refineries, as designed to prevent abuses from such recomputation of base period net income rather than as the authorization for it. See, contra, Bulova Watch Co. v. United States, 163 F.Supp. 633, 636, 143 Ct.Cl. 342 (1958), aff'd on other grounds, 365 U.S. 753, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961). The failure of Congress to enact a provision similar to § 734 with re-

spect to the recomputation of income for an excess profits year is readily explicable; few taxpayers would omit a deduction for such a year, and when one was omitted and later claimed for purposes of the excess profits credit, this was almost bound to be at a time when the Commissioner was not yet barred by limitation from demanding a corresponding adjustment for the prior year in the rare cases where the Government would profit by it. Congress could readily have directed that the unused excess profits credit for any year should be determined on the basis of the excess profits net income as finally determined for that year. But Congress did not say that, and what it did say does not produce a result so absurd that we should read into the statute words that Congress did not put there. C. I. R. v. Acker, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959); Hanover Bank v. C. I. R., 369 U.S. 672, 687–688, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962). Contrast J. C. Penney Co. v. C. I. R., 312 F.2d 65 (2 Cir. 1962).

My brothers seek to buttress their position by stressing that the deduction here in question was a war loss, which, in their view, was "elective" and which Standard "elected" not to claim. I see nothing in the language of § 127 of the 1939 Code or in the legislative history that makes a war loss elective in anything other than the practical sense in which all deductions have long been recognized to be—that "a taxpayer may neglect or refuse to make a correct computation of income in a given year and pay a greater tax than he owes—and nobody will force the excess tax back upon him." Even Realty Co., 1 B.T.A. 355, 362–363 (1925). The real test of the alleged "elective" character of the war loss deduction would be the rare instance where, because of the complex interrelations in the Code, insistence by the Commissioner on a deduction would increase the tax. I find nothing to preclude him from taking that position; although Shahmoon v. C. I. R., 185 F.2d 384 (2 Cir. 1950) and Kenmore v. C. I. R., 205 F.2d 90 (2 Cir. 1953) are not decisive, they at least point that way. When Congress has desired to provide a true election, it has not left the matter to guesswork but has established, or authorized the Commissioner to establish, definite procedures for making the election so that no one can ever be uncertain how matters stand; we have just sustained the Commissioner in refusing to allow the benefit that would have come from election to taxpayers who had not strictly complied with such a provision although their intention to elect was not really doubtful. Lambert v. C. I. R., 338 F.2d 4 (2 Cir. 1964), affirming T. C. Mem. 1963–296. Also, if the war loss deduction were indeed elective, I am unable to understand how Standard is thought to have elected not to take it in any sense here relevant. In its 1943 excess profits tax return it elected to take the deduction in order properly to reflect its 1941 net income and, accordingly, its unused excess profits credit for that year —which is all that it now seeks. I likewise see no basis for finding an election in Standard's behavior in 1947 when it failed to respond to the revenue agent's suggestion that it amend its 1941 income tax return, but left standing the computation taking the deduction from 1941 net income in its 1943 excess profits tax return. Neither Standard nor the Commissioner thought at that time that the 1941 war loss deduction had any significant tax consequences; Standard no more "elected" to forego the war loss deduction than the Commissioner "elected" not to insist upon it. If my brothers are saying only that Standard *had* to revise its 1941 return at some time if it wished to use the 1941 war losses in computing its unused excess profits credit, there is no need to talk about election. That is the issue, first here discussed, as to which I respectfully disagree.

I would reverse for further necessary proceedings in the District Court.