COLUMBIAN ROPE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 83757, 88062, 4548-62, 1718-63. Filed July 27, 1964.

*Charles L. Kades,* for the petitioner.
*Joseph Wilkes,* for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in the petitioner's income tax as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 83757 | 1956 | $1,300.97 |
|  | 1957 | 12,984.19 |
| 88062 | 1958 | 66,869.76 |
| 4548-62 | 1959 | 46,703.95 |
|  | 1960 | 35,255.94 |
| 1718-63 | 1961 | 171,680.05 |

In an amendment to the answer filed by respondent to the petitioner's second amended petition in docket No. 83757, the respondent claimed an additional deficiency in petitioner's income tax for 1957 to reflect the stipulated inclusion in petitioner's taxable income for

1957 of the additional amount of $89,054.41. In his answer to the first amended petition filed by petitioner in docket No. 88062, the respondent claimed "any increased deficiency" for 1958 which might arise from the allowance of a foreign tax credit for 1958 claimed by petitioner in its first amended petition. Respondent, in his answer to the petitioner's first amended petition in docket No. 4548-62, claimed "any increased deficiency" for 1960 which might arise from the allowance of a foreign tax credit for 1960.

By stipulation filed in docket No. 83757 the parties have reached settlement of the issues raised for the years 1956 and 1957, and these 2 years remain open solely for determining any net operating loss carryback to 1956 and any net operating loss carryback and carryover to 1957.

By stipulation filed in docket No. 88062 the parties settled all issues for the year 1958 except the issue whether a foreign tax credit claimed by petitioner for that year was barred by the statute of limitations. Respondent on brief concedes that the petitioner may now elect to take the foreign tax credit in lieu of the foreign tax deduction for 1958 (as well as for 1959 in docket No. 4548-62) and that the statute of limitations does not bar such election. The amount of the credit may be computed in the Rule 50 computation.

The issues remaining before us in these consolidated cases are (1) whether the undistributed income of a wholly owned foreign subsidiary of petitioner (Empresa Intercontinental, S.A., a Panama corporation) is includable in petitioner's taxable income in the years 1959, 1960, and 1961; (2) whether petitioner may deduct as ordinary and necessary business expenses in 1959, 1960, and 1961 the portion of the salaries paid by petitioner for employees of a wholly owned foreign subsidiary (Columbian Rope Co. of Philippines, Inc.), as well as a portion of the salaries paid to petitioner's executives whose duties included the supervision of the operations of the wholly owned foreign subsidiary; (3) whether petitioner incurred a deductible loss in 1960 as a result of the conversion of Philippine pesos into dollars in that year; and (4) whether petitioner is entitled to a deduction in 1961 due to the purported worthlessness of stock owned by petitioner in Tulatex Corp. and other obligations owed by that corporation.

FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Columbian Rope Co., hereinafter called petitioner, was incorporated in New York in 1903 for the purpose of engaging in the manufacture and sale of fiber products. Since then petitioner has been engaged in manufacturing and selling rope, cordage, cables, hemp twine,

yarn, and similar products. Petitioner's principal plant and its principal office are located in Auburn, N.Y.

Petitioner, as the parent corporation, filed consolidated returns for 1958 and 1959 with the following affiliates: The Edwin H. Filter Co., the R. A. Kelly Co., and Kelowas, Inc. During these 2 years the books of the petitioner and of the other members of the affiliated group were kept on an accrual method of accounting. The returns for 1960 and 1961 included only the income of the petitioner, which kept its books for those years on an accrual method of accounting. The returns for all of the years here involved were filed with the district director of internal revenue for central New York State at Syracuse, N.Y.

Petitioner purchases raw materials in the Philippine Islands and in countries in Africa and Central and South America. Petitioner sells manufactured products throughout the world. For many years petitioner maintained a branch office first at Davao in the Philippine Islands and later at Manila. Before World War II the Philippine branch operated primarily as a supplier of abaca fiber to petitioner and, to a limited extent, also sold abaca fiber to other purchasers. Between 1945 and 1951 the Philippine branch had a spectacular growth and its employees increased from a prewar 300 to 1,200 in 1951. American personnel at the Philippine branch numbered from 12 to 15 in 1951. The Philippine branch not only exported abaca to countries other than the United States, and in the United States to competitors of petitioner, but began to engage in other activities such as the handling of general agencies for steamship companies and the sale of fish, tires, canned goods, and other commodities. Petitioner, in its 1950 Federal income tax return, reported $338,974.48 as profits for that year from its Philippine branch.

The Central Bank of the Philippines (hereinafter called the Central Bank) was authorized by the Central Bank Act of June 1948 and commenced operations early in 1949. The Central Bank, an institution completely government owned and controlled, is the Philippine government's fiscal agent, banker, and adviser on financial and economic matters. The Central Bank has the statutory objective of maintaining monetary stability, preserving the international stability and convertibility of the peso, and promoting a rising level of production, employment, and real income in the Philippines. It performs banking operations for other banks and the Philippine Government and deals with the public only in the course of open market operations. The Central Bank has broad regulatory authority and credit and exchange operations of the banking system and controls exports to ensure that the foreign exchange proceeds are surrendered to its authorized agent. As a general rule, no commodity may be exported from the

Philippines unless covered by a draft and unless collection of the proceeds will be undertaken by an authorized agent. The Central Bank, as a part of its export licensing controls, maintained supervision over the export prices of abaca fiber.

In 1949 the Central Bank imposed exchange restrictions and established procedures for the licensing of foreign exchange transactions. The exchange controls were first placed in effect on December 9, 1949. On December 31, 1949, the Governor of the Central Bank issued a notification on the subject of peso assets of nonresidents providing that "all dealings in or with respect to assets described in paragraph 2 of Central Bank Circular No. 20 of December 9, 1949 which are expressed in pesos and which belong to any * * * branch office * * * or corporation * * * not residing or located within the Philippines are subject to license."

During 1951 the Central Bank issued licenses to the Philippine branch permitting it to use some of its 1950 peso profits to purchase foreign exchange, and a total of $60,689.72 (from the 1950 profits) was remitted to petitioner in several installments during 1951. The Central Bank also issued a license in 1951 authorizing the remittance of $46,968 out of the 1951 profits of the Philippine branch.

Pursuant to respondent's Mim. 6475, petitioner, in its 1951 Federal tax return elected to report its 1951 profits from the Philippine branch in the amount of 870,423.36 pesos as deferrable income. In its return the petitioner declared (pursuant to Mim. 6475) that "the deferable income will be included in income when it is no longer deferable * * *."

On July 11, 1951, Columbian Rope Co. of Philippines, Inc. (hereinafter called the Philippine subsidiary), was incorporated under the laws of the Republic of the Philippines as a wholly owned subsidiary of petitioner. In 1958 the Philippine subsidiary purchased all of the stock of the Luzon Brokerage Co., Inc., which name was subsequently changed to Luzon Brokerage Corp. Luzon Brokerage Corp. is the largest brokerage firm in the Philippines and not only clears imports through customs but also owns a fleet of 60 trucks, storage warehouses, operates packing and crating departments, and acts as general agent for an internationl survey or inspection firm with headquarters at Geneva, Switzerland.

In 1958 the Philippine subsidiary also organized a wholly owned subsidiary called the House of Travel, Inc., and in 1959 purchased an 88-percent interest in the Sanitary Steam Laundry. The Philippine subsidiary also acted as general agent for several shipping companies.

The official exchange rate of the Philippine peso was 2 pesos equal $1. In March 1957 the Central Bank promulgated circular No. 73 which authorized the use of blocked peso profits of nonresidents for the

direct purchase of gold bullion in the Philippine market up to 25 percent of the total gold bullion output of the local mining companies, plus whatever portion of the output which could not be sold by the mining companies to the Government; and the circular further required that any gold bullion purchased by this means had to be sold to the Central Bank at the official rate of $35 per ounce payable in dollars. In 1957 gold bullion could be purchased at an average rate of about 127 pesos per ounce, and since it had to be sold to the Central Bank at an official rate of $35 per ounce in dollars, this was equivalent to an effective exchange of about 3.60 pesos per dollar.

It was stipulated in docket No. 83757 (1956 and 1957) that "there should be included as additional income to petitioner for the taxable year 1957, $89,054.41, representing the amount of blocked 1951 income of petitioner's Philippine Island branch which ceased to be deferable in the year 1957." It is stipulated that the amount of $89,054.41 was determined by converting the sum of 324,270.89 pesos into dollars at the rate of 3.64 pesos per dollar, which rate was based on the price of 127.42 pesos per ounce of gold.

After the March 1957 directive of the Central Bank, the Philippine subsidiary made repeated efforts in 1957, 1958, and 1959 to purchase gold in the local market but was unable to do so because of the limited gold production in those years.

On October 22, 1958, the Central Bank issued revised regulations providing that all blocked funds must be deposited in "special blocked fiduciary accounts" with commercial banks before December 15, 1958, which could be used, among other specified purposes, to purchase gold at free market rates. On December 10, 1958, the Philippine subsidiary, on behalf of petitioner, applied for a license to open a special account under the above-mentioned regulations of the Central Bank, and on December 3, 1959, the Central Bank authorized the Philippine subsidiary, on behalf of petitioner, to deposit 324,270.89 pesos as "representing unremitted residual balances of profits and dividends."

On March 2, 1960, petitioner entered into a contract to purchase 2,161.8 ounces of gold from a Philippine gold producer at a price of 150 pesos per ounce, or a total of 324,270.89 pesos, out of the "special blocked fiduciary account." On March 9, 1960, the Central Bank agreed to pay petitioner in dollars for said gold at the official rate of $35 per ounce (equivalent to an effective rate of 4.285 pesos per dollar) or a total of $75,663, less a service charge. In April and May 1960 the Central Bank paid to petitioner a total of $75,436.71 for the gold which had been purchased by petitioner with the 324,270.89 pesos in its "special blocked fiduciary account," and the account was closed.

After World War II the petitioner sought to expand the sale of abaca, first through its Philippine branch and then through its Philip-

pine subsidiary, in the world fiber market rather than to use the branch or the subsidiary merely to supply petitioner. By 1959 the Philippine subsidiary accounted for 19 percent of all exports of abaca fiber from the Philippines; in 1960 it accounted for 16 percent and in 1961 for 17.7 percent of such exports. During 1959 the Philippine subsidiary sold less than 15 percent of its abaca fiber to the petitioner, about 10 percent in 1960, and about 22 percent in 1961. During these 3 years the Philippine subsidiary also sold its abaca fiber to other United States importers and to importers in Europe, the British Commonwealth, Japan, and Korea.

The Philippine subsidiary supplied abaca to petitioner at a price which excluded any element of profit to the subsidiary or any charge against the fiber for the administrative expenses of the subsidiary. The price paid by petitioner to its Philippine subsidiary covered the cost of the raw fiber purchased by the subsidiary (including commissons paid to Philippine suppliers of fiber) plus the cost of receiving, cleaning, classifying, baling, warehousing, and shipping the fiber to shipside in the Philippines. When petitioner purchased abaca in the New York market it paid the New York landed market price, which was customarily higher than the price paid by petitioner to the Philippine subsidiary.

In hiring American personnel to work in the Philippines, the petitioner found it necessary to pay these employees at least partly in dollars because such employees were reluctant to depend upon the continued stability of the Philippine peso, and because they needed dollars to discharge certain of their personal needs and obligations in the United States. After the incorporation of the Philippine subsidiary in 1951, petitioner paid in dollars 50 percent of the salaries and related benefits (such as social security taxes, group insurance premiums, and retirement plan contributions) of certain officers and employees employed in the Philippine Islands by the Philippine subsidiary. With the exception of one Dutch national, the officers and employees so paid were American citizens, and all of the persons paid in this manner resided in the Philippines. The total amounts of such salaries paid by petitioner in dollars to officers and employees of the Philippine subsidiary in 1959, 1960, and 1961 were $48,175, $46,337.50, and $46,550, respectively. The remaining half of the salaries of these officers and employees was paid in pesos by the Philippine subsidiary.

The total amount of the salaries paid by petitioner to the officers and employees of the Philippine subsidiary was included by the subsidiary in its income from operations reported on its tax returns to the Philippine Government and deducted as salaries.

In 1959 E. R. Metcalf was president of the petitioner, R. L. Morris was executive vice president, and F. R. Metcalf was vice president of the petitioner, as well as president of the Philippine subsidiary. In 1960 and 1961, R. L. Morris was president of the petitioner, while F. R. Metcalf was executive vice president of petitioner and president of the Philippine subsidiary.

In 1959, 1960, and 1961, F. R. Metcalf and H. G. Metcalf were members of the board of directors of both petitioner and the Philippine subsidiary. R. L. Morris was a member of the board of directors of the Philippine subsidiary during the years 1959 through 1961.

During the years 1959 through 1961, F. R. Metcalf was in charge of all foreign operations and of the purchase of about 30 million pounds annually of fibers, both natural and artificial, of which about 6 million pounds consisted of abaca fiber from the Philippines. In 1961 F. R. Metcalf was also placed in charge of petitioner's manufacturing operations. F. R. Metcalf has made six to eight trips to the Philippines (three or four trips since 1952), staying each time about a month. R. L. Morris has visited the Philippine Islands for a discussion of general policy twice, both times since 1957, staying each time for about 2 weeks. H. G. Metcalf has not been to the Philippine Islands since the 1920's.

The Philippine subsidiary, as a matter of policy, sent members of its staff abroad to promote sales of abaca and to look after its other business connections abroad. Considerable difficulty was experienced by the Philippine subsidiary in obtaining foreign exchange for this purpose. Generally, the Philippine exchange control authorities would license the purchase of dollars with pesos at the rate of about $10 per day for traveling expenses, while the actual expenses incurred by the personnel traveling abroad would average about $40 per day. The Philippine exchange controls also made it difficult and time consuming for the Philippine subsidiary to handle adjustments of claims made by its overseas customers in connection with the sales of the abaca fiber.

In June 1957 Merle S. Robie, vice president and general manager of the Philippine subsidiary, recommended to petitioner that a wholly owned foreign subsidiary be formed outside of the Philippine Islands to assist the operations of the Philippine subsidiary by providing the necessary dollar exchange for the subsidiary's employees and to provide a reserve against losses anticipated from a further devaluation of the Philippine peso. In July 1957 Empresa Intercontinental, S.A. (hereinafter called Empresa), was incorporated under the laws of the Republic of Panama as a wholly owned subsidiary of petitioner.

The officers of Empresa during the years 1959, 1960, and 1961 were as follows:

| | 1959 | 1960 | 1961 |
|---|---|---|---|
| President | F. R. Metcalf. | D. S. Hathaway. | D. S. Hathaway. |
| Vice president | M. S. Robie. | M. S. Robie. | M. S. Robie. |
| Vice president | D. S. Hathaway. | | |
| Treasurer | D. S. Hathaway. | D. S. Hathaway. | D. S. Hathaway. |
| Secretary | Carlos Icaza A. | Carlos Icaza A. | Carlos Icaza A. |
| Asst. secretary | H. R. Seymour. | | |

Empresa opened a bank account in the First National City Bank, Panama branch, in the city of Panama, in 1957 and maintained it through 1961. In January 1960 Empresa leased a one-room office in the city of Panama. Empresa had two employees, one of whom only worked part time. Hathaway, who was a resident of Panama during the period here involved, kept or supervised the records and books of account for Empresa in his capacity as treasurer. These included a general journal, a general ledger, cash receipts and disbursements journals, and monthly operating and financial statements.

Empresa received its income as follows: After the importer of abaca from the Philippine subsidiary fixed the sale price to his customer, the importer would deduct (a) the price per bale of abaca to be paid to the Philippine subsidiary (cost and insurance); (b) expenses paid by the importer, including ocean freight, weighing, customs clearance, and financing costs; and (c) the importer's commission. Any balance (approximately $1 per bale plus 1 percent of the amount of cost plus insurance) would be credited to Empresa's account.

Empresa financed the travel and promotional expenses connected with the fiber sales, merchandise imports, and other operational activities of the Philippine subsidiary. Empresa settled claims made by purchasers of abaca from the Philippine subsidiary concerning adjustments for color, degree of cleaning, quality, timeliness of deliveries, or weight of the fiber, and also made adjustments of contract prices to conform to the invoice prices required by the export department of the Central Bank. Empresa also handled adjustments in the accounts of the Philippine subsidiary in its dealings with the various merchandising firms and shipping companies outside of the Philippine Islands. The Philippine subsidiary imported Scotch whiskey into the Philippine Islands, and Empresa opened letters of credit in favor of the supplier in Scotland, which the subsidiary was unable to do itself because of regulations of the Philippine authorities.

In 1952 petitioner organized a subsidiary, Columbian Rope do Brasil, Ltda., under the laws of Brazil with an initial capital contribution of $6,000 for the purpose of purchasing Brazilian sisal to be used by petitioner and also to be sold to others. Empresa advanced about $120,000 to the Brazilian subsidiary. Subsequently, petitioner

sold its interest in the Brazilian subsidiary to Empresa for $6,000, and sometime later Empresa sold a 60-percent interest in the Brazilian subsidiary to Dutch interests for a net price of about $62,000.

In 1959 Empresa organized a subsidiary organization in Taiwan to import merchandise into Taiwan and also to engage in export activities. The enterprise, encountering United States tariff quotas on textiles and also troubled with personnel problems, was abandoned after one transaction involving the export of textiles to the United States. In 1961 Empresa acquired a majority interest in a Canadian corporation engaged in the manufacture of cordage products. In 1958, 1960, and 1961 Empresa investigated the possibility of investing in various enterprises in Panama, Australia, and Peru, but nothing materialized from these investigations.

Empresa's net income for the years 1959, 1960, and 1961 was $288,034, $223,420, and $182,733.30, respectively. In 1959 Empresa paid a dividend of $150,000 to petitioner, and in 1960 Empresa paid dividends totaling $200,000 to petitioner. Empresa paid no dividends to petitioner in 1961. Empresa was dissolved on May 25, 1962.

Early in 1958 petitioner sold its entire inventory of finished Corotex and raw materials used in its manufacture to the Tulatex Corp., a Vermont corporation. Petitioner had been manufacturing this product at its Auburn plant. Corotex was the trade name for a resilient material made from fiber impregnated with rubber and used for packaging purposes. In February 1958 petitioner and Tulatex Corp. executed an agreement under which petitioner received in payment for its inventories (1) a demand promissory note dated February 27, 1958, in the amount of $12,000, bearing interest at 6 percent per annum, and executed by John A. Moreland, Jr., as president of Tulatex Corp., and (2) 167 shares of common stock of Tulatex Corp. The agreement also provided that certain machinery used in the manufacture of Corotex would be leased by petitioner to Tulatex Corp. for a period of 5 years at a monthly rental of $1,000. On the same date Moreland (individually) and petitioner executed an agreement containing restrictive covenants with respect to the 500 shares of common stock in Tulatex Corp. which were owned by Moreland.

By the end of 1961 the note was unpaid and no interest payments had been made to petitioner on the note. During 1961 Tulatex Corp. made no rental payments to petitioner for the leased machinery. In late 1960 and during 1961 various creditors secured attachments against the assets of Tulatex Corp. in excess of $300,000. There were also other claims outstanding against Tulatex Corp. at this time which, together with the claims involved in the attachments, amounted to

approximately $450,000. At the time of trial Moreland was making efforts to pay the outstanding liabilities of Tulatex Corp.

Sometime before the end of 1961 Tulatex Corp. agreed with a party in Mexico to provide the machinery and know-how to establish a Mexican corporation (Pan American Tulatex) to manufacture rubberized fiber padding. The investment by Tulatex Corp. in Pan American Tulatex represented a 50-percent interest in the new corporation. Among the assets of Pan American Tulatex were machinery, equipment, inventory, and certain building improvements. Pan American Tulatex incurred a loss of about $12,000 as of the end of 1961.

In its annual reports for its fiscal years ending July 31, 1961 and 1962, filed with the State of Vermont, Tulatex Corp. showed assets of $250,459.47 and $265,128.69 and liabilities of $503,219.77 and $441,-882.12 for its fiscal years 1961 and 1962, respectively. The assets of Tulatex Corp. as of July 31, 1961 and 1962, consisted primarily of its 50-percent interest in Pan American Tulatex and a note receivable from the Mexican corporation.

At the time of this trial, Tulatex Corp. was exclusive world sales agent for Pan American Tulatex, and Tulatex Corp. maintained an office in Burlington, Vt. At the time of trial Tulatex Corp., in addition to Moreland, had three salaried employees and one employee on commission.

It is stipulated that the petitioner's basis in the note is $12,000, that its basis for the 167 shares of Tulatex Corp. stock is $74,187.40, and that the leased machinery rentals due in 1958 and 1959 and upaid as of the end of 1961 were in the amount of $8,011.47. It has also been stipulated that the note, the 167 shares of stock, and the rentals due in the amount of $8,011.47 did not become wholly or partially worthless prior to January 1, 1961.

Petitioner, in its corporation income tax return for 1960, claimed a deduction of $13,649.40 [1] for a loss sustained "on realization of prior year's foreign branch income." Respondent determined that the loss was "not deductible under sections 162 and 165 of the [1954] Internal Revenue Code."

Respondent determined that the undistributed income of Empresa in 1959, 1960, and 1961 was includable in petitioner's taxable income as "foreign dividend income" in each of those years in the amounts of $138,034, $23,420, and $182,733.30, respectively.

Respondent determined that certain expenses deducted by petitioner in 1959, 1960, and 1961 in the amounts of $85,297.52, $99,057.15, and $86,614.93, respectively, were expenses incurred on behalf of foreign affiliates and did not constitute ordinary and necessary expenses within the meaning of section 162 of the 1954 Internal Revenue Code. A

---

[1] On brief, petitioner claims a deduction in the reduced amount of $13,617.70.

summary of these disallowed expenses in 1959, 1960, and 1961 is as follows:

### 1959

| | | |
|---|---:|---:|
| Salaries paid by petitioner for employees of: | | |
| Petitioner's home office | $26, 500. 06 | |
| Philippine subsidiary | 48, 175. 00 | |
| Empresa and Columbian Rope do Brasil, Ltda | 21, 200. 00 | |
| | [1] 95, 875. 00 | |
| Less: Reimbursement to petitioner by Empresa for the salaries paid by petitioner for the employees of Empresa and the Brazilian corporation | 24, 000. 00 | |
| | | $71, 875. 00 |
| Traveling expenses | | 44. 00 |
| Insurance | | 2, 538. 00 |
| Federal F.I.C.A. taxes | | 1, 128. 00 |
| Retirement plan contributions | | 9, 278. 52 |
| Miscellaneous expenses | | 434. 00 |
| | | 85, 297. 52 |

### 1960

| | | |
|---|---:|---:|
| Salaries paid by petitioner for employees of: | | |
| Petitioner's home office | 35, 500. 06 | |
| Philippine subsidiary | 46, 337. 50 | |
| Empresa and Columbian Rope do Brasil, Ltda | 19, 400. 00 | |
| | [1] 101, 237. 50 | |
| Less: Reimbursement by Empresa | 13, 875. 00 | 87, 362. 50 |
| Traveling expenses | | 9. 00 |
| Insurance | | 2, 030. 00 |
| Federal F.I.C.A. taxes | | 819. 00 |
| Retirement plan contributions | | 8, 780. 65 |
| Miscellaneous expenses | | 56. 00 |
| | | 99, 057. 15 |

### 1961

| | | |
|---|---:|---:|
| Salaries paid by petitioner for employees of: | | |
| Petitioner's home office | 35, 500. 06 | |
| Philippine subsidiary | 46, 550. 00 | |
| Empresa and Columbian Rope do Brasil, Ltda | 8, 400. 00 | |
| | 90, 450. 06 | |
| Less: Reimbursement by Empresa | 14, 100. 00 | 76, 350. 06 |
| Insurance | | 2, 697. 17 |
| Federal F.I.C.A. taxes | | 841. 55 |
| Retirement plan contributions | | 6, 706. 19 |
| Miscellaneous expenses | | 19. 96 |
| | | 86, 614. 93 |

[1] These are the figures used in the statutory notices of deficiency.

The reimbursements made by Empresa to petitioner in 1959, 1960, and 1961 for the salaries paid by petitioner for employees of Empresa and Columbian Rope do Brasil, Ltda., were included by petitioner in its taxable income for those years.

The salaries disallowed included: (1) The one-half portion of the salaries paid by petitioner in dollars to certain employees of the Philippine subsidiary who (with the exception of one Dutch national) were United States citizens resident in the Philippine Islands; (2) a portion of the salaries of F. R. Metcalf, H. G. Metcalf, and R. L. Morris, all of whom were officers and/or directors of petitioner and who were residents of Auburn, N.Y.; (3) a portion of the salaries of purchasing clerks employed by petitioner at Auburn, N.Y.; and (4) all or a portion of the annual salaries paid to D. S. Hathaway, who was an executive officer of Empresa in 1959, 1960, and 1961 and a resident of Panama during that period, and Robert Brown, who was general manager of the Brazilian corporation in 1959 and 1960. The other related payments (social security taxes, group insurance premiums, etc.) disallowed by respondent in the years 1959, 1960, and 1961 were connected with the categories of employees listed in the above tables.

In the statutory notice of deficiency covering petitioner's taxable year 1959 (docket No. 4548–62) the respondent disallowed any deductions or losses due to the alleged worthlessness of notes and accounts receivable from Tulatex Corp. or the 167 shares of Tulatex Corp. stock held by petitioner because the worthlessness of these items was not established. It has now been stipulated that these items did not become wholly or partially worthless prior to January 1, 1961. In its petition filed in docket No. 1718–63 (1961), the petitioner alleges that notes and accounts receivable from Tulatex Corp. in the total amount of $20,011.47 became wholly worthless in 1961, and that the 167 shares of stock in Tulatex Corp. in the amount of $74,187.40 held by petitioner also became worthless in 1961.

OPINION

The first issue is whether respondent was correct in including the undistributed income of Empresa (a wholly owned foreign subsidiary of petitioner) in the taxable income of petitioner in 1959, 1960, and 1961. Respondent contends that Empresa's principal function in Panama was to serve as a "conduit of dollars" from the Philippine subsidiary to the petitioner. Respondent states on brief that Empresa was no more than the petitioner's "bank account in Panama" and that petitioner withdrew money as it was needed for petitioner's own purposes, such as the payment of dividends or financing other ventures. Respondent states that the routing of dollars to Empresa was accomplished by an "arbitrary overcharge" for the fiber sale by the Philip-

pine subsidiary to its customers (other than petitioner) and that this overcharge was credited to Empresa.

It is difficult to discern the basis for respondent's contentions. The Philippine subsidiary was a wholly owned foreign subsidiary of the petitioner. It was generally true prior to 1962 that the earnings of foreign subsidiaries were taxable to the domestic parent only when such earnings were actually distributed to the parent.[2] The Philippine subsidiary conducted its own business as a leading exporter of abaca fiber to markets in all parts of the world. Although petitioner obtained much of its abaca fiber from the Philippine subsidiary, the record shows that sales by the subsidiary to other customers in the United States exceeded the sales to petitioner in each of the years 1959, 1960, and 1961. Income derived from the sale of fiber clearly belonged to the Philippine subsidiary, not to petitioner. Petitioner was not in the business of selling fiber. It would seem that no justification existed to attribute the income of the Philippine subsidiary to the petitioner.

When Empresa was formed by petitioner in 1957 as a wholly owned foreign subsidiary in Panama, it was presumably for the purpose of alleviating some of the dollar-shortage difficulties faced by the Philippine subsidiary as a result of Philippine exchange restrictions. Among Empresa's functions were (1) to settle claims (in dollars) made by customers of the Philippine subsidiary as to quality, quantity, color, or other defects in the fiber sold by the subsidiary and (2) to provide travel expenses in dollars for the business trips made outside the Philippines by executives and employees of the Philippine subsidiary.

The funds obtained by Empresa for these and other purposes came out of the proceeds of fiber sales made by the Philippine subsidiary to its customers (other than petitioner). The portion of the sales price so diverted by the Philippines subsidiary to Empresa amounted to about $1 per bale of fiber, plus 1 percent of the amount of "cost plus insurance" per bale. Petitioner performed no services for the Philippine subsidiary in connection with these fiber sales, so that it cannot be said that a part of *petitioner's* income was being diverted to Empresa. There is no problem here as to a reallocation of income between related taxpayers to properly reflect their respective income, which might arise where a taxpayer sells to a foreign subsidiary at an unrealistic discount, or buys from a foreign subsidiary at an artifically high price. See sec. 482, I.R.C. 1954.

If Empresa had not been formed and, instead, all of the proceeds from the world sales of fiber were remitted directly to the Philippine

---

[2] The Revenue Act of 1962 provided that certain types of income of controlled foreign corporations, even though undistributed, were to be included in the income of U.S. shareholders (as defined by the statute) in the year the income was earned by the foreign corporation. Secs. 951–964, I.R.C. 1954.

subsidiary, it is clear (as we have indicated earlier) that its profits would not be includable in petitioner's taxable income until they were actually distributed to the petitioner. We do not see how the presence of Empresa calls for any different result. Nothing is changed: the income is still generated by the same fiber sales by the Philippine subsidiary on the world market, except that now some of the income, instead of returning to the Philippines, comes to rest in Panama.

Respondent urges on brief that we should disregard the entity of Empresa and "attribute the earnings which were temporarily passing through Empresa as actually having been received by the ultimate beneficiary," i.e., the petitioner. Empresa was a separate corporate entity duly organized under the laws of Panama, where it actually performed certain business functions. Under these circumstances, its separate corporate identity cannot be ignored. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436.

We find, and so hold, that the undistributed income of Empresa was not includable in petitioner's taxable income in the years 1959, 1960, and 1961.

The next issue is whether respondent properly disallowed the deduction by petitioner in 1959, 1960, and 1961 of a portion of the salaries and related payments to (1) certain executives and clerical employees of the petitioner at Auburn, N.Y., and (2) certain executives and employees of the Philippine subsidiary who resided and worked in the Philippines. It is respondent's contention that the amounts disallowed in both groups above were expenses paid by petitioner on behalf of its foreign subsidiary and are therefore not deductible by the petitioner as ordinary and necessary expenses incurred in its own trade or business. Sec. 162(a), I.R.C. 1954.

As to the disallowed deductions involving the executives and clerical employees of the petitioner at Auburn, N.Y., we believe the respondent is in error. In each of the 3 years involved, the respondent disallowed one-half of the $23,000 annual salary of F. R. Metcalf and a smaller percentage of the salaries of H. G. Metcalf and R. L. Morris,[3] and a portion of the salaries paid to the purchasing clerks. It is clear from the record that the services of these executives were rendered to petitioner which was engaged in the manufacture and sale of fiber products. Both F. R. Metcalf and R. L. Morris were top executive officers of petitioner during these years, while H. G. Metcalf was chairman of the executive committee of petitioner's board of directors during this period. They worked at Auburn, N.Y., and visited the Philippines only on infrequent occasions. F. R. Metcalf was in

---

[3] During the years here involved, H. G. Metcalf received an annual salary of $22,750, while the annual salary of R. L. Morris was $24,000. Respondent disallowed $3,000 of the salaries of each of these executives in 1959 and $6,000 of their respective salaries in 1960 and 1961.

charge of all foreign operations of the petitioner and of all purchases of fiber, of which only about 20 percent came from the Philippines. Petitioner is among the leading manufacturers of rope in the United States, with substantial annual sales. We think it fairly appears that an enterprise of this size would demand most, if not all, of the time of its top executives.

It is also obvious, we believe, that it was within the scope of their duties, as top executives of petitioner, to give some attention to petitioner's significant investment in its Philippine subsidiary, which was not only an important source of needed fiber but was also engaged in other operations in the Philippines. The record indicates that the Philippine subsidiary was quite adequately staffed with American personnel who lived and worked in the Philippines. We believe that any time devoted by the petitioner's top executives to the Philippine subsidiary was simply in the nature of general supervision which would be an ordinary and necessary part of their duties in conducting and managing petitioner's business.

Similarly, it is our view that no part of the services of petitioner's purchasing clerks at Auburn, N.Y., can be said to have been performed for the Philippine subsidiary. Presumably, it is respondent's position that a significant portion of petitioner's fiber purchases were from the Philippine subsidiary and that a portion of the duties of the clerical help was thus performed for the benefit of the foreign subsidiary. We find no merit in such a contention.

It appears from respondent's brief that the disallowance of the payments to this group of petitioner's executives and employees is based largely on certain entries made in petitioner's books. Respondent states that the petitioner, on its books, charged the Philippine subsidiary with a portion of the salaries paid to at least some executives of this group, and that this is an admission that these executives performed services for the foreign subsidiary. Respondent is placing undue emphasis on these book adjustments. They are certainly not conclusive as to the proper tax treatment to be given to the items involved. Entries of this type were in the nature of internal cost controls and would be made only for internal accounting purposes. This would be especially appropriate here where the parent corporation was obtaining fiber from its foreign subsidiary at a cost price.

We find, and so hold, that petitioner was entitled to deduct in full the payments in 1959, 1960, and 1961 to its executives and clerical personnel at Auburn, N.Y. Such payments constituted reasonable compensation within the meaning of section 162(a) of the Internal Revenue Code of 1954.

We reach a different result as to the second group of executives and employees involved under this issue. Since 1951, when the Phil-

ippine subsidiary was incorporated, the petitioner paid about one-half of the salaries and related payments of certain executives and employees in the employ of the foreign subsidiary. These executives and employees, who, with one exception, were American citizens, resided in the Philippines. This salary arrangement was adopted to overcome the reluctance of these executives and employees to accept employment in the Philippines if their entire salaries were paid in pesos. But the fact remains that they were all in the employ of a separate and distinct corporate entity. See *Moline Properties, Inc.* v. *Commissioner, supra.*

It is established that where a taxpayer undertakes to pay the obligations of another taxpayer, such payments are not deductible as ordinary and necessary expenses incurred in the payor's trade or business. *Interstate Transit Lines* v. *Commissioner,* 319 U.S. 590; *Deputy* v. *DuPont,* 308 U.S. 488.

Petitioner argues that in return for its dollar payments to the Philippine subsidiary's personnel, the petitioner was able to purchase abaca fiber from its foreign subsidiary at a cost price which was less than the New York market price. Consequently, petitioner contends that such dollar payments to the personnel of the foreign subsidiary are deductible either as a business expense or as part of its cost of goods sold.

We do not agree. We are not at all convinced that these salary payments in dollars are linked to the procurement of fiber from the foreign subsidiary at cost. Petitioner admits that no such understanding with its wholly owned foreign subsidiary was "formalized in a written contract" and that petitioner's books do "not unequivocally reflect such payments as part of the cost of goods." No correlation exists between the salary payments and the difference between the New York market price of fiber and the cost price at which the foreign subsidiary sold its fiber to the petitioner. The absence of any such correlation is further emphasized by the fact that the Philippine subsidiary sold only a fraction of its fiber to the petitioner, and that the subsidiary was actively engaged in other extensive business operations in the Philippines. Yet petitioner regularly paid one-half of the salaries of the personnel in question who were employed by the foreign subsidiary.

We believe the record clearly shows that petitioner undertook these payments simply to aid its wholly owned foreign subsidiary to obtain the services of needed management personnel. A successful operation of the foreign subsidiary, through the services of such personnel, would obviously inure to the benefit of the petitioner as parent corporation. Petitioner's willingness to undertake this obligation is understandable. But we do not believe that these dollar payments of

salaries and related payments can be construed as petitioner's own business expense as a part of its cost of goods sold. We sustain the respondent on this issue.

A third group of employees under this same issue involves D. S. Hathaway, who was an executive officer of Empresa in 1959, 1960, and 1961, and Robert Brown, who in 1959 and 1960, was general manager of Columbia Rope do Brasil, Ltda. (organized by petitioner in 1952). In 1959 petitioner paid the full salaries of these two employees in the total amount of $21,200 and was reimbursed by Empresa in the amount of $24,000. In 1960 the total salaries of these two employees paid by petitioner amounted to $19,400, and the reimbursement by Empresa was $13,875. In 1961, the petitioner paid $8,400 of Hathaway's total salary of $14,000, and the reimbursement by Empresa was in the amount of $14,100.

It is evident from the record that both Hathaway and Brown were not employees of the petitioner. Petitioner does not contend otherwise, but merely asserts on brief that no discussion of the deductibility of these salary payments will be necessary because over the 3 years involved petitioner made total salary payments of $49,000 and was reimbursed by Empresa in the total amount of $51,975.

We agree with petitioner as to 1959 and 1961, since in each of these years the reimbursements by Empresa exceeded the disputed salary payments to Hathaway and/or Brown. But in 1960 the salary payments by petitioner to these two employees of the two foreign subsidiaries exceeded Empresa's reimbursements to petitioner by $5,525. It would be incorrect, as petitioner suggests, to deal in totals covering a span of 3 separate tax years. It has long been established that the Federal income tax is an annual tax, based upon a fixed annual accounting period. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359. Petitioner has the burden to show that the salary payments to Hathaway and Brown in 1960, to the extent that such payments exceeded the reimbursements from Empresa, were ordinary and necessary business expenses in that year. Apart from petitioner's assertion that the 3 years must be treated as a single unit, it has made no serious attempt to show that Hathaway and Brown in 1960 performed any services whatever in petitioner's trade or business, and the record indicates that the contrary is true.

We find, and so hold, that petitioner is not entitled to deduct as ordinary and necessary business expenses in 1960 the salary payments petitioner made to Hathaway and Brown to the extent that such payments exceeded the Empresa reimbursements.

The next issue is whether petitioner sustained a deductible loss under section 165 of the Internal Revenue Code of 1954 in the year 1960 when it converted into dollars the foreign currency (pesos) which

had been included in petitioner's taxable income in 1957 as the profits of its foreign branch. Up to the year 1951, petitioner operated a branch in the Philippines. It was generally true that the profits of a foreign branch (as distinguished from a foreign subsidiary) would be includable in the domestic parent's taxable income in the year such profits were earned by the foreign branch.

As a result of exchange controls imposed by the Philippine Government, the petitioner elected under respondent's Mim. 6475, 1950–1 C.B. 50,[4] to defer the 1951 profits (expressed in terms of pesos) of its Philippine branch. Mim. 6475 provided that a "taxpayer * * * may elect to use a method of accounting * * * in which the reporting of 'deferable income' as taxable income is deferred until the income ceases to be 'deferable income,' at which time it is includible in gross income."

In 1957 the Philippine Government authorized the use of blocked peso profits of nonresidents for the purchase of gold bullion in the Philippines which had to be sold to the Philippine Government at the official rate of $35 per ounce.[5] In a joint stipulation filed with this Court in docket No. 83757 (1956 and 1957) it was stipulated that the amount of $89,054.41 was includable in petitioner's taxable income for 1957, representing the amount of the blocked 1951 income of its Philippine branch which ceased to be deferable in 1957.[6]

After repeated efforts to purchase gold bullion, petitioner in March 1960 managed to purchase gold with its 324,270.89 pesos, and within a few days sold the gold to the Philippine Government for a total of $75,663.[7] After service charges, petitioner received from the Philip-

---

[4] 2. For the purposes of this mimeograph, the term "deferable income" is used to describe income received by, credited to the account of, or accrued to a taxpayer which, owing to monetary exchange or other restrictions imposed by a foreign country, is not readily convertible into United States dollars or into other money or property which is readily convertible into United States dollars. However, income ceases to be "deferable income" when, to the extent thereof, (a) money or property in such foreign country is readily convertible into United States dollars or into other money or property which is readily convertible into United States dollars; (b) notwithstanding the existence of any laws or regulations forbidding the exchange of money or property into United States dollars, conversion is actually made into United States dollars or other money or property which is readily convertible into United States dollars; or (c) such income is disposed of by way, of gift, bequest, devise, or inheritance, or by dividend or other distribution, or, in the case of a resident alien, a taxpayer terminates his residence in the United States.

3. A taxpayer, whether individual, corporate, or other, may elect to use a method of accounting (sections 41–43, Internal Revenue Code) in which the reporting of "deferable income" as taxable income is deferred until the income ceases to be "deferable income," at which time it is includible in gross income.

[5] This was equivalent to an effective exchange rate of about 3.60 pesos per dollar, since in 1957 gold bullion could be purchased at an average rate of about 127 pesos per ounce.

[6] The amount of $89,054.41 was determined by converting the sum of 324,270.89 pesos. into dollars at the rate of 3.64 pesos per dollar, which rate was based on the price of 127.42 pesos per ounce of gold.

[7] Since the gold was purchased at 150 pesos per ounce, and then sold to the Philippine Government at $35 an ounce, this would be equivalent to an effective rate of 4.285 pesos per dollar.

pine Government a total of $75,436.71, and petitioner now claims this difference of about $13,617 ($89,054 minus $75,436.71) as a loss deductible in 1960.

Respondent's entire argument seems to be that the "facts and the law of this case with respect to this issue were decided by the stipulation of the parties" and that insofar as the parties are concerned this was a closed transaction in 1957. We do not believe that the joint stipulation of the parties is dispositive of this issue. The stipulation merely states that the deferred 1951 foreign branch income "ceased to be deferable in the year 1957" and was, therefore, under the direction of Mim. 6475, includable in petitioner's taxable income in that year. As of 1957 the petitioner, by agreeing to pay the U.S. tax on its foreign currency, had, in effect, acquired a basis ($89,054.41) in such foreign currency. Subsequently, when petitioner actually received only $75,436.71 in 1960 when its foreign currency (by then devalued) was converted into dollars, petitioner suffered a loss on its tax-paid foreign currency.

An analogous situation existed in *Foundation Co.*, 14 T.C. 1333. There a domestic taxpayer agreed with the Chilean Government to perform certain construction work in Chile and under the agreement the Chilean Government agreed that all payments would be made at a fixed rate exchange. As work progressed, the accrual basis taxpayer accrued as income about $711,362.96 at the agreed peso exchange rate. Chile then imposed exchange controls and subsequently paid the taxpayer with a devalued peso so that the earlier accruals of income and the reporting of such income in the taxpayer's income tax returns exceeded what was actually received in payment of sums due under the contract. We held that the taxpayer's "inclusion of $711,362.96 in gross income previously, gives it 'a basis for gain or loss,'" and that consequently the taxpayer was entitled to deduct in 1943 the difference between what was reported as accrued income and what was actually received in subsequent years. See also *Anderson, Clayton & Co. v. United States*, 168 F. Supp. 542 (Ct. Cl. 1958).

*American Pad & Textile Co.*, 16 T.C. 1304, and *Frederick Vietor & Achelis* v. *Salt's Textile Mfg. Co.*, 26 F. 2d 249 (D. Conn. 1928), which are cited by respondent, are not in point. Both cases involve the correctness of various methods used by domestic taxpayers to measure in dollars, for the purpose of the United States income tax, the foreign currency profits of a foreign branch. Neither case is concerned with the issue before us. Here there is no dispute as to the measure in dollars of the foreign currency to be included in petitioner's taxable income in 1957. This amount has been stipulated. We are concerned only with the tax effect of events which took place in a subsequent year, i.e., 1960.

We hold that petitioner is entitled to a deduction in 1960 under section 165 of the 1954 Internal Revenue Code for the loss realized by it when it converted its foreign currency into dollars in that year.

The last issue is whether petitioner is entitled to a deduction in 1961 due to the alleged worthlessness in that year of the Tulatex Corp. note and account receivable and the 167 shares of Tulatex Corp. stock held by petitioner. Petitioner apparently claimed a deduction for these items in 1959, the year after petitioner had sold certain inventory to the Tulatex Corp. and had received in payment the note and the stock. The amounts receivable arose from certain rental obligations. It is now stipulated that these items did not become wholly or partially worthless prior to January 1, 1961. In its petition in docket No. 1718–63 petitioner now claims these items became worthless in 1961.

The question is one of fact and we do not believe that the petitioner has met its burden of showing that events in 1961 showed these items to be wholly or partially worthless in that year within the meaning of the statute. Petitioner relies heavily upon the insolvency of Tulatex Corp. in 1961, its loss operations in that year, and the attachments against its assets by creditors in 1961 and prior years "amounting to $450,000." Yet, Moreland (petitioner's president) testified that "I have involuntarily contributed $650,000 worth of assets that are being forced for sale at this point, the proceeds of which are being used to pay the Tulatex liabilities * * *." While much of Moreland's testimony is unclear, we think it appears that a serious effort was being made to extricate Tulatex Corp. from its financial difficulties and that, as of the end of 1961, there existed a reasonable prospect for the repayment of its liabilities and obligations including those held by petitioner.

Nor can we find that the 167 shares of Tulatex Corp. stock were worthless in 1961. At the time of trial, Tulatex Corp. was still in operation (with at least four employees and Moreland) as exclusive sales agent for a Mexican corporation called Pan Americana Tulatex. This Mexican corporation apparently was engaged in the manufacturing operation previously carried on by Tulatex Corp., which now had a 50-percent interest in the Mexican venture. The Mexican corporation, which was probably formed in 1961, included among its assets machinery, equipment, inventory, and certain building improvements. It would seem that a reasonable expectation existed that the Tulatex Corp., both as exclusive sales agent and through its participation in the Mexican manufacturing operation, would produce a profit. We cannot say that, under these facts, the stock in the Tulatex Corp. could be deemed to have been worthless in 1961. See *Boehm* v. *Commissioner*, 326 U.S. 287; *Sterling Morton*, 38 B.T.A. 1270, affd. 112 F. 2d 320.

On the basis of the facts in this case, we find that the petitioner has failed to establish that the Tulatex Corp. stock or the obligations due from Tulatex Corp. became wholly or partially worthless as of the end of 1961.   We sustain respondent on this issue.

*Decisions will be entered under Rule 50.*